JPL:JKW/JS
F. #2022R00155

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

Criminal Docket No. 23-499 (S-1) (KAM)

RAYMOND JOHN PIRRELLO, JR. et al.,

Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

MEMORANDUM OF LAW REGARDING THE APPLICABLE
UNITED STATES SENTENCING GUIDELINES RANGE,
LOSS AMOUNT, RESTITUTION, AND FORFEITURE

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

JESSICA K. WEIGEL
JAMES R. SIMMONS
Assistant U.S. Attorneys
(Of Counsel)

**TABLE OF CONTENTS**


| | | |
|---|---|---|
| PRELIMINARY STATEMENT | | 1 |
| BACKGROUND | | 1 |
| ARGUMENT | | 5 |
| I. | The Applicable Guidelines Range Regarding Loss | 5 |
| | A. The Government's Guidelines Calculation | 5 |
| | B. Loss Calculation | 6 |
| II. | Restitution | 13 |
| | A. Applicable Law | 13 |
| | B. Discussion | 14 |
| III. | Forfeiture | 17 |
| | A. Applicable Law | 17 |
| | B. Discussion | 20 |
| CONCLUSION | | 23 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Libretti v. United States,
516 U.S. 29 (1995) ........ 18

United States v. Bellomo,
176 F.3d 580 (2d Cir. 1999) ........ 18

United States v. Boccagna,
450 F.3d 107 (2d Cir. 2006) ........ 14

United States v. Burdi,
414 F.3d 216 (1st Cir. 2005) ........ 13

United States v. Calderon,
944 F.3d 72 (2d Cir. 2019) ........ 13

United States v. Capoccia,
503 F.3d 103 (2d Cir. 2007) ........ 18

United States v. Catoggio,
326 F.3d 323 (2d Cir. 2003) ........ 14

United States v. Coppola,
671 F.3d 220 (2d Cir. 2012) ........ 6

United States v. Coriaty,
300 F.3d 244 (2d Cir. 2002) ........ 14

United States v. Donaghy,
570 F. Supp. 2d 411 (E.D.N.Y. 2008) ........ 13, 14

United States v. Fatico,
579 F.2d 707 (2d Cir. 1978) ........ 1

United States v. Futrell,
209 F.3d 1286 (11th Cir. 2000) ........ 13

United States v. Germosen,
139 F.3d 120 (2d Cir. 1998) ........ 13

United States v. Jones,
No. 23-6113, 2024 WL 3371191 (2d Cir. July 11, 2024) ........ 6

United States v. Lacey,
699 F.3d 710 (2d Cir. 2012) ........ 7

United States v. Mandell,
752 F.3d 544 (2d Cir. 2014) ........ 20

United States v. Mathieu,
853 F. App'x 739 (2d Cir. 2021) ........ 19

United States v. Milstein,
481 F.3d 132 (2d Cir. 2007) ........ 16

United States v. Monsanto,
491 U.S. 600 (1989) ........ 17

United States v. Naranjo,
No. 13-CR-351 (JSR), 2015 WL 2381322 (S.D.N.Y. May 13, 2015) ........ 20

United States v. Ng Chong Hwa,
No. 18-CR-538 (MKB), 2023 WL 4194002 (E.D.N.Y. Mar. 24, 2023) ........ 18

United States v. Peters,
732 F.3d 93 (2d Cir. 2013) ........ 18, 21

United States v. Pico,
2 F.3d 472 (2d Cir. 1993) ........ 7

United States v. Powell,
831 F. App'x 24 (2d Cir. 2020) ........ 6

United States v. Prince,
110 F.3d 921 (2d Cir. 1997) ........ 7

United States v. Rainford,
110 F.4th 455 (2d Cir. 2024) ........ 6, 7

United States v. Roberts,
660 F.3d 149 (2d Cir. 2011) ........ 19

United States v. Sapoznik,
161 F.3d 1117 (7th Cir. 1998) ........ 13

United States v. Torres,
703 F.3d 194 (2d Cir. 2012) ........ 19

United States v. Treacy,
639 F.3d 32 (2d Cir. 2011) ........ 19

United States v. Walters,
910 F.3d 11 (2d Cir. 2018) ... 19

United States v. Watson,
No. 23-CR-82 (EK), 2025 WL 510814 (E.D.N.Y. Feb. 16, 2025) ... 20

United States v. Yalincak,
30 F.4th 115 (2d Cir. 2022) ... 17

**Statutes**

15 U.S.C. § 78j(b) ... 1

18 U.S.C. § 371 ... 1

18 U.S.C § 664(h) ... 17

18 U.S.C. § 981(a) ... 18, 19, 20

18 U.S.C. § 1349 ... 1

18 U.S.C. § 1956(c)(7) ... 18

18 U.S.C. § 1961 ... 18

18 U.S.C. § 2461(c) ... 18

18 U.S.C. § 3663A ... 13, 14, 17

18 U.S.C. § 3664 ... 14

18 U.S.C. § 3742 ... 6

28 U.S.C. § 2461(c) ... 17, 18

## PRELIMINARY STATEMENT

The government respectfully submits this memorandum in advance of the evidentiary hearing pursuant to United States v. Fatico, 579 F.2d 707 (2d Cir. 1978), scheduled for October 27, 2026. Specifically, the government sets forth its positions regarding the loss amount that should be used when calculating the applicable United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") range for defendants Raymond John Pirrello, Jr., also known as "Ray John," and Joseph Passalaqua, as well as the amount of restitution and forfeiture that should be imposed at sentencing.

## BACKGROUND

On March 3, 2026, defendants Pirrello and Passalaqua pleaded guilty, without an agreement with the government, to all three counts with which they were charged in the superseding indictment: (1) securities fraud conspiracy, in violation of 18 U.S.C. § 371; (2) wire fraud conspiracy, in violation of 18 U.S.C. § 1349; and (3) securities fraud, in violation of 15 U.S.C. § 78j(b). See Superseding Indictment, ECF Dkt. No. 44 ("Superseding Indictment"); Mar. 3, 2026 Minute Entries, ECF Dkt. Nos. 148, 149.

These charges arose from the defendants' multi-year scheme to defraud investors and prospective investors in securities offered by Late Stage Management ("Late Stage") by making material misrepresentations and omissions relating to, among other things, the existence and amount of fees paid by investors in stock offered by Late Stage. See Superseding Indictment, ¶ 17.

Late Stage managed a series of investment funds and invested in stock issued by privately held companies that, at the time of investment, purportedly anticipated either making an Initial Public Offering ("IPO") or being sold to a larger business in the relatively near term. Id. ¶ 1. Late Stage acquired these shares through an affiliate company called Capital Truth

Holdings ("Capital Truth"). Id. Late Stage, in turn, solicited investments in these stocks from individual investors, including investors located in the Eastern District of New York, using a series of marketing companies based in New Jersey, New York and Florida (the "sales offices"). Id. Late Stage then published a list of available stocks and dictated to the sales offices at what prices these stocks could be sold. Id. ¶ 18. Late Stage, through the sales offices, solicited investments in various companies with household names, such as Airbnb and Palantir, as well as more obscure and lesser-known companies, such as Earth to Energy and Green Life Farms. See id. ¶¶ 5–6.

Pirrello, also known as "Ray John," held no official title at Late Stage or any of the sales offices, but worked as a partner to the leadership of Late Stage. Id. ¶ 7. Due to his long disciplinary history from multiple regulators, which included a permanent bar issued against him by the U.S. Securities and Exchange Commission, Pirrello intentionally kept his name out of Late Stage's business, purposefully withholding his identity from relevant documents and representations made to investors regarding the firm's leadership. Id. ¶ 30(c). An individual referred to as "Co-Conspirator #1" in the Superseding Indictment was the managing partner of Late Stage. An individual referred to as "Co-Conspirator #2" in the Superseding Indictment was the President of Capital Truth and acted as a business partner to Pirrello and Co-Conspirator #1.

In addition to being an undisclosed principal of Late Stage, Pirrello directed the operation of the sales offices, including Prior2IPO Consulting LLC ("Prior2IPO Consulting" or "Prior2IPO"). Id. ¶ 7. Pirrello also held the title of "Public Relations Specialist" at Green Life Farms and Energy to Energy, and was the founder of Green Life Farms. Id. Passalaqua worked as the Chief Executive Officer ("CEO") of Prior2IPO. Id. ¶ 9.

Together with Co-Conspirator #1 and Co-Conspirator #2, Pirrello dictated the pitch language that was used by employees at the sales offices to market investments in Late Stage.

Id. ¶ 20. As part of that pitch, Pirrello directed the employees in their conversations with investors to depict the fund as having "no up front fees," and to specify that the only fee that would be charged to investors would be a carried interest of 20% of their profits upon exiting the investment. Id. Investors were therefore led to believe that all their invested capital was used to purchase stock. Id. In reality, however, a fee ranging from 10–100% of each investment was extracted up front in the form of a markup to the price of the stock. Id.; see id. ¶¶ 24–26. The upfront revenue generated by the inclusion of these markups was then used to pay the principals of Late Stage, the defendants and the employees of the sales offices. See id. ¶¶ 20, 27.

As set forth in more detail below, between approximately March 2016 and March 2023, Late Stage raised approximately $859 million from over five thousand investors, including investors residing in the Eastern District of New York,[1] in more than 40 pre-IPO companies. To date, many of these companies have gone public. Between March 2019 and June 2022, i.e., a subset of the conspiracy period, Late Stage raised approximately $789 million from investors and more than $88 million of this was diverted in the form of undisclosed upfront compensation and fees.

At his guilty plea on March 3, 2026, Pirrello allocuted that from 2016 through 2023, at his direction, "salespersons misled investors to believe that we earned no upfront compensation on the sale of Late Stage securities in order to increase the chances that people would invest." Mar. 3, 2026 Tr. at 30:20–23.[2] According to Pirrello, "[t]hese statements were false" because "[i]n reality, we earned upfront compensation based on each sale transaction." Id. at 30:24–25. Pirrello

---

[1] This figure is based on investor lists produced by Late Stage to the government, which were produced to the defendants in discovery. See EDNY-00382060.

[2] A copy of the transcript from Pirello's plea is attached hereto as Exhibit A.

further admitted that "[t]hese statements are material to investors when deciding to purchase securities; as such, these were material misrepresentations I knew to be false." Id. at 30:25–31:3. Pirrello told the Court that he profited "a few million dollars" from the scheme—"[m]aybe two to three million dollars over a seven-year period." Id. at 33:13–17.

Similarly, when he pleaded guilty on March 3, 2026, Passalaqua admitted that "salespersons under my direction and I agreed to and did mislead investors to believe that salesperson like myself earned no upfront compensation on the sale of Late State Management securities." Mar. 3, 2026 Tr. at 28:3–6.[3] He further stated, under oath, that he "regularly repeated" the phrase "that Late Stage charges no upfront fees" even though, "in actuality, those statements were false as we earned upfront compensation based on each sales transaction." Id. at 28:9–13. According to Passalaqua, "[t]hese statements were material to investors when deciding to purchase…securities, and as such, were material misrepresentations that I knew to be false." Id. at 28:13–15. Passalaqua also explained that an "upfront fee" was "kind of written as that the security was offered at that set price, but that wasn't the price that the fund purchased it at, when, in fact, it was marked up from another company by Late Statement Management." Id. at 29:5–9. Passalaqua admitted that he personally obtained "approximately $2 million" from the scheme that was his "to keep." Id. at 33:3–10.

When pleading guilty, Passalaqua also explained, under oath, how the funds flowed as part of the scheme. First, "private securities were purchased by a third-party company called Capital Truth Holdings." Id. at 30:2–4. After, "Capital Truth Holdings would then set the price and the markup and sell them to Late Stage Management." Id. at 30:8–10. According to Passalaqua, Late Stage Management was under the control of Pirrello "to an extent." Id. at 31:7.

---

[3] A copy of the transcript from Passalaqua's plea is attached hereto as Exhibit B.

Then, "once the money came in," Passalaqua received payment by "submit[ting] an invoice to Mr. Pirrello's company, Valeo Capital," which sent him money. Id. at 32:16–17. To clarify how this arrangement worked, Passalaqua explained that he "would submit an invoice for X dollars, and [Pirrello] would wire [him] or write a check for the amount owed." Id. at 33:25–34:2.

## ARGUMENT

## I. The Applicable Guidelines Range Regarding Loss

### A. The Government's Guidelines Calculation

As set forth during the defendants' change of plea proceedings and in the written penalty sheets submitted to the Court in connection with those proceedings, the government submits that the defendants' respective adjusted offense levels under the Guidelines are as follows:

#### 1. Pirrello

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | | 7 |
| Plus: | Loss exceeded $65,000,000 (U.S.S.G. § 2B1.1(b)(1)(M)) | +24 |
| Plus: | Offense involved 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Violation of administrative order (U.S.S.G. § 2B1.1(b)(9)) | +2 |
| Plus: | Registered broker or dealer (U.S.S.G. § 2B1.1(b)(20)) | +4 |
| Plus: | Organizer or leader (U.S.S.G. § 3B1.1(a)) | +4 |
| Plus: | Obstruction of justice (U.S.S.G. § 3C1.1) | +2 |
| Less: | Acceptance of responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Total: | | 43 |

#### 2. Passalaqua

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | | 7 |
| Plus: | Loss exceeded $65,000,000 (U.S.S.G. § 2B1.1(b)(1)(M)) | +24 |
| Plus: | Offense involved 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Registered broker or dealer (U.S.S.G. § 2B1.1(b)(20)) | +4 |

| | | |
|---|---|---|
| Less: | Zero-Point Offender (U.S.S.G. § 4C1.1)) | -2 |
| Less: | Acceptance of responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Total: | | 33 |

The government estimates that both defendants are in Criminal History Category I. Accordingly, Pirrello's effective Guidelines range is 45 years' imprisonment, as his Guidelines range is capped by the statutory maximum sentence. Passalaqua's effective Guidelines range is 135 months to 168 months' imprisonment.

B. Loss Calculation

The government is prepared to prove that investor-victims in this case lost at least $88,017,974 as a result of the defendants' fraudulent scheme, which corresponds to an enhancement of 24 points under the Guidelines.

1. Applicable Law

"[A] district court is not required to calculate loss with absolute precision, but need only by a preponderance of the evidence make a reasonable estimate of the loss given the available information." United States v. Powell, 831 F. App'x 24, 25–26 (2d Cir. 2020) (quoting United States v. Coppola, 671 F.3d 220, 250 (2d Cir. 2012) (internal quotation marks omitted)); U.S.S.G. § 2B1.1 cmt. n.3(B) (stating "[t]he court need only make a reasonable estimate of the loss," and "the court's loss determination is entitled to appropriate deference" (citing 18 U.S.C. § 3742(e) and (f))). A district court's factual determinations regarding loss are reviewed for clear error. See United States v. Rainford, 110 F.4th 455, 476 (2d Cir. 2024). The Court of Appeals has explained that it will find error "only if, after reviewing all of the evidence, [it is] left with the definite and firm conviction that a mistake has been committed." United States v. Jones, No. 23-6113, 2024 WL 3371191, at *2 (2d Cir. July 11, 2024). "[O]n clear error review, even if there are 'two permissible views' of the facts," the "factfinder's choice between them cannot be clearly

erroneous." Rainford, 110 F.4th at 477–78. "[B]ecause the sentencing court is in a unique position to assess the evidence and estimate the loss based upon that evidence, the sentencing court's loss determination is entitled to appropriate deference." United States v. Lacey, 699 F.3d 710, 720 (2d Cir. 2012) (internal quotation marks and citations omitted) (noting that this deferential standard is "certainly applicable" where the sentencing judge "presided over a weeks-long trial and heard a great deal of live testimony"). The district court has "broad discretion" to consider "all relevant information" when making factual findings related to sentencing. United States v. Pico, 2 F.3d 472, 475 (2d Cir. 1993); see also United States v. Prince, 110 F.3d 921, 924 (2d Cir. 1997).

2. Discussion

There is no dispute that the defendants (and others at their direction) lied to investors about the fact that they earned upfront compensation based on each sale of Late Stage securities. More specifically, the defendants and salespeople working at their direction misrepresented to investors that Late Stage charged "no upfront fees," that the only fee that would be charged to investors would be a carried interest of 20% of their profits upon exiting the investment, and that "we don't make money unless you make money." Investors were therefore led to believe that all their invested capital was used to purchase stock.

In reality, however, a fee ranging from 10-100% of each investment was extracted up front in the form of a markup to the price of shares and paid to the Late Stage principals and sales offices.[4] At their respective plea hearings, the defendants each admitted that salespersons

---

[4] Pirrello would circulate to the sales offices lists of available stocks to market to investors. Among other information, the lists indicated the cost at which Late Stage obtained the shares and the price at which the sales offices could offer the shares to investors, which reflected a markup. See, e.g., EDNY_00238948, EDNY_00238959, EDNY_00238962, EDNY_00238963, EDNY_00238967, EDNY_00238964, EDNY_00238957. Pirrello also communicated cost and pricing information via text message, which indicated a significant markup to the securities offered by Late Stage. See, e.g., EDNY-00317047.

under their direction made false and misleading statements to Late Stage investors to lead the investors to believe that Late Stage and its affiliated sales personnel earned no upfront compensation on the sale of Late Stage securities. See Ex. A at 30 (Pirrello); Ex. B at 28 (Passalaqua). But, in reality, the defendants earned upfront compensation "based on each sale transaction." Ex. A. at 30:24–25 (Pirrello); Ex. B at 28:9–13 (Passalaqua).

The dispute as to the loss figure relates to the amount of undisclosed upfront compensation diverted from investor contributions. At the upcoming Fatico hearing, the government is prepared to prove that Late Stage investors sustained an actual loss of at least approximately $88 million. As explained in more detail below, this figure represents investor money that was used to compensate the Late Stage principals, the defendants and employees of the sales offices, instead of being used to purchase shares on behalf of investors.

* * *

Between at least March 2016 and March 2023, Late Stage raised approximately $859 million from over five thousand investors who sought to invest in pre-IPO companies.[5] Late Stage acquired shares in these pre-IPO companies from Capital Truth through a series of "open-end" contracts, see, e.g., EDNY-00020411–EDNY-00020431, and then sold these interests to investors. Late Stage sent investor money to Capital Truth. Capital Truth, in turn, (i) delivered shares in pre-IPO companies to Late Stage and (ii) diverted a portion of the investor contributions to bank accounts associated with (1) Valeo Capital Corporation and Valeo Capital Markets (collectively, "Valeo"), entities wholly controlled by the defendant Pirrello,[6] and (2) Vero

[5] See supra footnote 1.

[6] See EDNY-00099412 (New Jersey business registration showing Pirrello's 100% ownership interest in Valeo Capital Markets); EDNY-00100121 (New Jersey business registration showing Pirrello's 100% ownership interest in Valeo Capital Corporation).

Enterprise Holdings LLC ("Vero"), an entity controlled by Co-Conspirator #1, the managing partner of Late Stage.[7] Pirrello kept a portion of the money received by Valeo from Capital Truth for himself. In addition, the sales offices were paid a percentage of the upfront fees charged to investors through Valeo.[8] The heads of the sales offices would submit invoices to Valeo, and Pirello in turn would wire them the money for the amount owed.[9]

Upon a successful exit event or IPO, Late Stage kept 20% of the profits or "carried interest" (with some portion of that 20% being shared with the sales offices) and the investor received the remaining 80%. The carried interest was paid in shares, not cash.[10]

To prove the process by which funds flowed between Late Stage, Capital Truth, Valeo, Vero, and other affiliated entities as part of the scheme, as described above, the government anticipates calling Marylee Robinson to testify at the Fatico hearing. Ms. Robinson is a Managing Director with Stout Risius Ross, LLC ("Stout"), a global investment bank and advisory firm

---

7 See EDNY-00022889 (listing Co-Conspirator #1 as the managing member of Vero); see also EDNY-00087407 (Wells Fargo business account application for Vero listing Co-Conspirator #1 as the "sole owner" of Vero).

8 See, e.g., FD-302 of Mar. 19, 2025 Interview of Witness-1 (sales office head explaining that he received 50% of the upfront fees charged to investors and his payments came from Valeo); FD-302 of May 13, 2022 Interview of Witness-2 (sales office head explaining that he received 60% of the upfront fees charged to investors and received payments from Valeo upon sending an invoice to Valeo).

9 See Ex. B at 32–34 (Passalaqua explaining that he "would submit an invoice for X dollars, and [Pirrello] would wire [him] or write a check for the amount owed").

10 See FD-302 of Apr. 13, 2022 Interview of Witness-3 at 3 (head of sales office explaining that any carried interest was paid by Late Stage in shares, and the shares would be sent to his brokerage account); FD-302 of Sept. 23, 2026 Interview of Witness-1 at 1 (sales office head explaining that any carried interest upon a successful IPO was delivered in shares, not cash); see also EDNY-00173010 and EDNY-00172975 (emails from Co-Conspirator #1 explaining that any carried interest would be distributed in shares); SEC-EDNY-PROD-000118771 (email from Co-Conspirator #2 explaining that any profit after a liquidity event is delivered in shares).

specializing in corporate finance, valuation, financial disputes, and investigations. Ms. Robinson is expected to testify that she reviewed bank records for Capital Truth and Valeo, among other entities, and prepared charts to identify certain relevant financial transfers from the bank records, including, for instance, between Late Stage, Capital Truth, Valeo, Vero and the sales offices, including Prior2IPO, a sales office run by the defendants Pirrello and Passalaqua. A draft of Ms. Robinson's proposed summary charts is attached as Exhibit C to this submission.

Investor lists produced by Late Stage establish that between March 2019 and June 2022, i.e., a subset of the conspiracy period, Late Stage raised approximately $789 million from investors. EDNY-00380960. The government expects that Ms. Robinson will testify that during this same time period, Late Stage transferred approximately $709 million to Capital Truth. Ex. C at 1. Accordingly, the government intends to argue that this approximate $709 million transfer represents investor contributions that investors believed would be used to purchase shares from Capital Truth. Ms. Robinson will further testify that during this same period, Capital Truth transferred approximately $77.6 million to bank accounts associated with Valeo (the "Valeo Accounts") and $10.3 million to bank accounts associated with Vero. Id. The government intends to argue that this combined approximately $88 million in funds that Capital Truth sent to the Valeo Accounts and Vero were actually used to compensate the Late Stage principals, the defendants and

other sales office personnel,[11] instead of being used to purchase shares on behalf of investors.[12] The actual loss to investors is thus $88 million.

The Honorable Jesse M. Furman of the Southern District of New York recently employed this same analysis when he determined the Guidelines loss in United States v. Castillero, et al., No. 23-CR-622 (JMF) (S.D.N.Y.)—a similar fraud scheme in which the defendants also diverted certain portions of investments in pre-IPO shares to pay themselves undisclosed upfront compensation and fees instead of purchasing additional pre-IPO shares that they represented to the victim-investors they would acquire. See Sentencing Hr'g Tr. at 30, Castillero, ECF Dkt. No. 247; see also Gov't Sent. Mem. at 18–20, Castillero, ECF Dkt. No. 216 (calculating loss by taking the total amount raised from investors and deducting the money used to purchase shares, and concluding that the delta represented the "actual loss to StraightPath investors because it was diverted—instead of being used to purchase shares on behalf of investors, it was paid to the

[11] Ms. Robinson will testify that between March 2019 and March 2022, Pirrello transferred approximately $52 million from bank accounts associated with Valeo to bank accounts associated with the sales offices, including approximately $11.1 million to bank accounts for Prior2IPO Consulting on which Passalaqua was a signer. Ex. C. at 1. Passalaqua kept at least approximately $1.8 million for himself and used it for, among other things, home remodeling and to purchase jewelry and watches. Id. at 4. Pirrello also kept a significant portion of the money the Valeo entities received from Capital Truth for himself. See id. at 3. He spent this money on, among other things, jewelry, watches, sports collectibles, cars and real estate. Id.

[12] In June 2026, the Court ordered the government to "file a letter listing the companies whose stocks the Government asserts were subject to undisclosed mark-ups in the relevant period, and which form the basis of the Government's loss calculation in light of the Fatico hearing scheduled for September 3, 2026." June 9, 2026 Min. Entry. The government filed a letter listing 23 companies. ECF Dkt. No. 156. Further analysis confirms that during the conspiracy period, the defendants sold pre-IPO interests in at least 40 companies. See EDNY-00380960. As the defendants admitted during their plea allocutions, they earned upfront compensation based on "every sale transaction." As set forth herein, the government's loss figure is based on the total amount of upfront compensation extracted by Late Stage between March 2019 and June 2022. The government has not conducted a markup analysis for each individual pre-IPO interest sold.

defendants, to their referral agents, or used to acquire shares other than what investors thought they had purchased").

At the Fatico hearing, the government anticipates that the defendants will argue that the government's proposed loss figure is overstated because although they admit they earned undisclosed upfront compensation on every securities sale transaction, some of the upfront compensation was "legitimate" because the value of the securities exceeded the price at which Late Stage had purchased the shares (the cost basis). In other words, the government expects the defendants to argue that although the defendants and their co-conspirators extracted an upfront fee in the form of a markup for each sale transaction, the markup is less than what the government estimates because the shares were worth more than their cost basis.[13] This contention is a red herring. The defendants have admitted that they lied to investors about the fact of any upfront compensation and concede that they earned upfront compensation on every sale transaction. It does not matter whether the defendants' upfront compensation derived from a markup or a fee or something else. The point is the defendants and those working at their direction told investors they were not making any money upfront on each sale transaction and, in reality, they consistently

[13] The parties dispute the definition of a "markup." The government avers that the markup is the difference between the price Late Stage paid to purchase the shares (the cost basis) and the price at which it sold the same shares to investors (the sale price). The government anticipates that the defendants will argue that the value of a stock must be considered in determining the markup. But in any event, this disagreement is irrelevant to the debate over loss because the defendants lied about receiving upfront compensation based on the sale transactions.

were.[14] Even assuming arguendo that some of the shares sold by Late State may have been worth more than their cost basis, this does not bear on the falsity of the defendants' statements concerning upfront compensation nor does it rebut the irrefutable financial records that reflect $88 million of investor funds flowing into accounts controlled by Pirrello and Passalaqua and other co-conspirators instead of being used to purchase pre-IPO shares.

For the reasons set forth above, the Court should find that investor-victims in this case lost at least $88,017,974 as a result of the defendants' fraudulent scheme, which corresponds to an enhancement of 24 points under the Guidelines.

## II. Restitution

### A. Applicable Law

Restitution is mandatory pursuant to 18 U.S.C. § 3663A. Losses must be awarded to a victim as restitution when the victim's losses are the direct and proximate result of the offense of conviction. See 18 U.S.C. § 3663A(a)(2); United States v. Calderon, 944 F.3d 72, 94–95 (2d Cir. 2019). "A restitution award," however, "need only to be a reasonable estimate of the victim's actual losses." United States v. Donaghy, 570 F. Supp. 2d 411, 423 (E.D.N.Y. 2008) (citing United States v. Germosen, 139 F.3d 120, 129–30 (2d Cir. 1998); United States v. Burdi, 414 F.3d 216, 221 (1st Cir. 2005); United States v. Futrell, 209 F.3d 1286, 1292 (11th Cir. 2000); United States

[14] Notably, the defendants appear to have personally purchased pre-IPO shares through Late Stage at significantly lower prices than non-insider investors. See EDNY-00380960. For instance, on April 19, 2019, Pirrello purchased shares of Pinterest, Inc. for $20, whereas another investor purchased this same stock at $25 on the same day. Id. On July 31, 2020, Pirrello purchased shares of Palantir Technologies Inc. ("Palantir") at $4.70, whereas other investors purchased shares of the same company on the same day for between $5.75 and $8.50. Id. On June 17, 2020, Passalaqua purchased shares of Palantir for $4.70, whereas other investors purchased shares of Palantir on the same day for between $6.75 and $9.50. Id. On August 9, 2021, Passalaqua, Co-Conspirator #2, Valeo Capital and Vero purchased Triller stock at $360 per share, whereas non-insider investors purchased Triller for between $580 and $620 per share on the same day. Id.

v. Sapoznik, 161 F.3d 1117, 1121–22 (7th Cir. 1998) (district judge's estimate of 25% of the defendant's salary not an abuse of discretion where no more precise number could be easily determined). Estimates of restitution are "appropriate" so long as the restitution award is based on "more than mere speculation about a victim's actual losses." Donaghy, 570 F. Supp. 2d at 423 (citing United States v. Catoggio, 326 F.3d 323, 329 (2d Cir. 2003)). "Uncertainties with respect to the amount in question should be resolved in favor of the victim in accord with the statutory focus on making the victim whole." Donaghy, 570 F. Supp. 2d at 423 (citing United States v. Boccagna, 450 F.3d 107, 119 (2d Cir. 2006) ("[R]estitution attempts to compensate for loss by restoring the victim to a position he occupied before the injurious event." (internal quotations and alterations omitted)); United States v. Coriaty, 300 F.3d 244, 253 (2d Cir. 2002) (observing "the statutory focus on the victim's losses and upon making victims whole"). To the extent there is any dispute as to the "proper amount or type of restitution," those disputes "shall be resolved by the court by the preponderance of the evidence." 18 U.S.C. § 3664(e).

B. Discussion

At the Fatico hearing, the government is prepared to demonstrate by a preponderance of the evidence that an order of $88 million in restitution, joint and several among the defendants, is warranted in this case.

In total, more than 5,000 persons and entities invested in Late Stage during the charged conspiracy period. Because these investors are the victims of the defendants' criminal conduct, they are entitled to restitution by law. See 18 U.S.C. § 3663A(a)(2) (defining a "victim" as a "person directly and proximately harmed as a result of the commission of an offense"). The victim-investors relied upon the defendants' representations that the defendants only made money if the victim-investors made money, and that there would be no upfront fees in connection with the victim-investors' investments. As both Pirrello and Passalaqua admitted under oath at their

guilty pleas, these representations were false, they were material to investors, and they were, in fact, relied upon by the investors when choosing to invest in Late Stage. Because the victim-investors were directly and proximately harmed by Pirrello and Passalaqua's commission of their offenses of conviction, the victim-investors are entitled to restitution by law.

The $88 million in total funds siphoned off by the defendants and their co-conspirators for their personal use resulted in significant losses to the victim-investors and is the appropriate measure of restitution here. Specifically, had these funds actually been used for their intended purpose, additional pre-IPO shares would have been acquired for the victim-investors. And to the extent that any of the companies associated with the unpurchased pre-IPO shares went public, the victim-investors have been further deprived of any resultant gains in the value of those unpurchased shares. In many ways, the $88 million in diverted funds is thus an underestimate of the true loss to the victim-investors since it does not account for additional incalculable losses attributable to the defendants' criminal conduct. The figure is also conservative because it represents losses for only a subset of the full conspiracy period—from March 2019 to June 2022.

The government respectfully proposes that the Court distribute the requested $88 million restitution award to the victim-investors based on the procedures set forth below. Judge Furman recently employed this methodology when he ordered restitution in Castillero. See Castillero, ECF Dkt. No. 243. Employing the procedures used by the court in Castillero, the government will assemble a list of all victim-investors in Late Stage during the time period of the defendant's charged criminal conduct. The government will then calculate each victim-investor's loss by: (1) taking the total value of each individual investment in Late Stage, (2) calculating the pro rata percentage of that contribution to the total investments in Late Stage, and (3) applying that percentage to the total restitution figure. This measure of loss is reasonable because it calculates

the average amount that the defendants diverted from all of the victim-investors to pay themselves. In sum, this methodology applies an average diversion percentage to each victim-investor's individual contribution in order to calculate what each one lost as a result of the defendants' diversion.

Further precision is impracticable here and not required by the law. While the markups that diverted investors' funds varied from investor to investor and investment to investment, the government is unaware of any 1:1 matching of investor funds and books and records that would permit the calculation of a mathematically precise amount of loss attributable to each victim-investor. The government has investor lists produced by Late Stage, which specify the pre-IPO shares each investor purchased and the price at which they purchased the stock from Late Stage. But the government does not have sufficient information based on Late Stage's books and records to determine the cost basis for each investment. Accordingly, the government has not been able to determine the exact markup applied to any given sale transaction. There can be no meaningful dispute based on the parties' plea allocutions, as well as other evidence in this case, that there was a markup applied to every sale transaction. Given this situation, the government's proposed formulation for allocating restitution readily meets the Second Circuit's requirement that the district court make a "reasonable estimate" of the actual loss "based on the evidence before it." United States v. Milstein, 481 F.3d 132, 137 (2d Cir. 2007).

Further, joint and several restitution liability is warranted here, which is permitted under the Mandatory Victims Restitution Act ("MVRA"). While apportionment may be appropriate in other cases, it is not here since both Pirrello and Passalaqua are at fault and each allocuted that they induced investments by misrepresenting to investors that there would be no upfront fees associated with their investments. Further, each defendant admitted under oath that

he made several million dollars in personal profits from the diverted funds. Based on this record, joint and several liability for restitution is appropriate. See United States v. Yalincak, 30 F.4th 115, 121-22 (2d Cir. 2022) ("Congress has vested the district court with considerable discretion in fashioning restitution orders. The statute governing the procedure for issuing and enforcing restitution orders provides that if the district court 'finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution'") (quoting 18 U.S.C § 664(h) (as made applicable to the MVRA by 18 U.S.C. § 3663A(d)).

Finally, to the extent that the defendants argue that their restitution award should be decreased to account for any investor gain on the pre-IPO shares that went public, such an argument is unpersuasive. Hypothetically, even if every Late Stage investment actually increased in value (which they did not), the victim-investors can still never recoup the diverted amount of shares that should have been invested for them along with any attendant gains on those unacquired shares. These losses cannot be remediated by any gains from shares that were actually purchased with undiverted funds or from any restitution this Court awards. Any such argument raised by the defendants should therefore be rejected.

For all of these reasons, the government respectfully submits that the Court should order a joint and several restitution award of $88 million.

## III. Forfeiture

### A. Applicable Law

#### 1. Forfeiture Rules and Statutes

Forfeiture is mandatory for defendants convicted of fraud offenses. 28 U.S.C. § 2461(c) ("If the defendant is convicted of the offense giving rise to the forfeiture, the court shall order the forfeiture of the property as part of the sentence in the criminal case." (emphasis added));

see United States v. Monsanto, 491 U.S. 600, 607 (1989) (concluding that statute setting forth that a court "'shall order' forfeiture of all property described" means that forfeiture is mandatory); United States v. Ng Chong Hwa, No. 18-CR-538 (MKB), 2023 WL 4194002, at *2 (E.D.N.Y. Mar. 24, 2023) (observing that "forfeiture is mandatory under the relevant criminal forfeiture statutes, 18 U.S.C. § 981(a)(1)(C) and 982(a)(1), and 28 U.S.C. § 2461(c)"). The forfeiture statutes that apply to the defendants' securities and wire fraud offenses, 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), require the forfeiture of all proceeds of their offenses. See 18 U.S.C. § 981(a)(1)(C) (requiring the forfeiture of "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to . . . any offense constituting 'specified unlawful activity'" as set forth in 18 U.S.C. §1956(c)(7), and further defined in 18 U.S.C. § 1961 to include wire fraud and "fraud in the sale securities"); see 18 U.S.C. § 2461(c). The forfeiture determination as to the amount of proceeds is governed by Rule 32.2 of the Federal Rules of Criminal Procedure.

Where, as in this case, forfeiture is sought in the form of personal money judgments, the district court "must determine the amount of money that the defendant will be ordered to pay." Fed. R. Crim. P. 32.2(b)(1)(A). That amount "may be based on evidence already in the record . . . and on any additional evidence or information submitted by the parties and accepted by the court as relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B); United States v. Capoccia, 503 F.3d 103, 109 (2d Cir. 2007).

At the forfeiture phase, "the government must establish the nexus between the offense and the forfeiture request by a preponderance of the evidence." United States v. Peters, 732 F.3d 93, 98 (2d Cir. 2013); see also Libretti v. United States, 516 U.S. 29, 49 (1995); Capoccia, 503 F.3d at 116; United States v. Bellomo, 176 F.3d 580, 595 (2d Cir. 1999) (upholding trial court's application of preponderance standard on grounds that criminal forfeiture is part of

sentencing). "[S]o long as there is a causal nexus between the wrongdoer's possession of the property and her crime, the property may be said" to be forfeitable. United States v. Torres, 703 F.3d 194, 199–200 (2d Cir. 2012).

"District courts are afforded broad discretion in calculating illicit gains based on the circumstances of a case." United States v. Walters, 910 F.3d 11, 32 (2d Cir. 2018). Because the "calculation of forfeiture amounts is not an exact science," the court "need not establish the [amount] with precision but rather need only make a reasonable estimate . . . given the available information." United States v. Treacy, 639 F.3d 32, 48 (2d Cir. 2011); see also United States v. Mathieu, 853 F. App'x 739, 742 (2d Cir. 2021) (observing that "[d]istrict courts are afforded broad discretion in calculating illicit gains based on the circumstances of a case" and may make "a reasonable estimate" given the available information and evidence). Accordingly, the court "may make reasonable extrapolations from the evidence established by a preponderance of the evidence at the sentencing proceeding." Treacy, 639 F.3d at 48; see United States v. Roberts, 660 F.3d 149, 166–67 (2d Cir. 2011) ("[D]istrict courts may use general points of reference as a starting point for a forfeiture calculation and make reasonable extrapolations supported by a preponderance of the evidence.").

2. Section 981's Application to Securities and Wire Fraud

Under 18 U.S.C. § 981(a)(1)(C), the "proceeds" of specified crimes—including securities fraud and wire fraud conspiracies—are subject to forfeiture. Section 981 defines "proceeds" differently in different cases, depending on whether the defendants transacted in "illegal goods" or "lawful goods." Section 981(a)(2)(A) calls for the forfeiture of all property obtained through the sale of illegal goods or services, with no netting of the defendant's costs. 18 U.S.C. § 981(a)(2)(A). Section 981(a)(2)(B), on the other hand, permits the direct costs "incurred in providing the goods or services" (excluding overhead expenses and income taxes) to be

deducted if proven by the defendant. Id. § 981(a)(2)(B).

Section 981(a)(2)(B) applies where, as here, the defendants provided a "lawful good"—shares in pre-IPO securities—to investors. See United States v. Watson, No. 23-CR-82 (EK), 2025 WL 510814, *1, *18 (E.D.N.Y. Feb. 16, 2025) (holding in a securities and wire fraud case that Section 981(a)(2)(B) applied where the "illegal transactions" at issue were the sale of stock pursuant to various misrepresentations).[15] This means the defendants have the burden to prove the "direct costs" to be deducted from the proceeds of the specified crimes. 18 U.S.C. § 981(a)(2)(B); United States v. Mandell, 752 F.3d 544, 554 (2d Cir. 2014) (holding that Section 981(a)(2)(B) "makes clear that the burden of proof is on [the defendant] with respect to the issue of direct costs"); United States v. Naranjo, No. 13-CR-351 (JSR), 2015 WL 2381322, at *3 (S.D.N.Y. May 13, 2015) ("Defendants bear the burden to prove not just that they incurred direct costs, but also the amount of the costs to be deducted.").

B. Discussion

As set forth above, at the Fatico hearing, the government is prepared to demonstrate by a preponderance of the evidence that Pirrello obtained approximately $77,688,200 in proceeds into corporate bank accounts he controlled, and Passalaqua obtained approximately $11,127,447 in proceeds into corporate bank accounts he controlled.[16] Accordingly, the government respectfully submits that the Court order Pirrello to pay forfeiture in the amount of $77,688,200 and Passalaqua to pay forfeiture in the amount of $11,127,447.

---

[15] The court in Watson noted, however, that some courts have suggested that Section 981(a)(2)(A) may apply where "the entity issuing the shares has no true operations at all, as would be the case in (for example) a Ponzi scheme." 2025 WL 510814, at *18 n.32.

[16] See supra footnote 11.

Pirrello obtained $77,688,200 in proceeds when they were received from Capital Truth into four Valeo bank accounts, each of which he controlled. See Ex. C at 1 (depicting that between March 2019 and June 2022, Capital Truth transferred $77,688,200 to Valeo bank accounts); see also id. at 2 (listing four Valeo bank accounts where Pirrello was the sole signer); see United States v. Peters, 732 F.3d 93, 103–04 (2d Cir. 2013) ("[A]n individual obtains proceeds indirectly through a corporation when the individual so extensively controls or dominates the corporation and its assets that money paid to the corporation was effectively under the control of the individual"). These proceeds represent upfront compensation that should have instead been used to purchase additional pre-IPO shares for investors. The Second Circuit has held that applying concepts of alter-ego liability, "in the context of a criminal forfeiture proceeding under section 982, an individual "obtains" proceeds "indirectly" through a corporation when the individual "so extensively control[s]," . . . or "dominate[s]," . . . the corporation and its assets that money paid to the corporation was effectively under the control of the individual." Id. Factors that the Second Circuit considers "relevant to this question include the individual's ownership interest; the level of control he exercised over the company; his authority to direct the disposition of corporate assets and the degree to which he exercised that authority; and the use of corporate assets for his personal expenses." Id. (internal citations omitted). Pirrello is the sole owner of Valeo Capital Corporation and Valeo Capital Markets, see supra footnote 6, and the sole signer on the Valeo bank accounts that received proceeds from Capital Truth, see Ex. C at 2. It was entirely his decision how to dispose of the corporate assets in those accounts. Indeed, he readily used corporate funds from the Valeo bank accounts to fund his personal expenditures. See Ex. C at 3. Accordingly, consideration of the Peters factors warrants a finding that the proceeds held in the Valeo Accounts were under his control such that he should be required to forfeit them.

The same analysis applies to Passalaqua's control of the investor proceeds diverted to Prior2IPO Consulting bank accounts instead of being used to purchase additional pre-IPO shares. Between March 2019 and March 2022, bank accounts associated with Valeo transferred approximately $11,127,447 to four bank accounts for Prior2IPO Consulting where Passalaqua was a signer (the "Prior2IPO Consulting LLC Accounts").[17] See Ex. C at 1, n.4. Consideration of the Peters factors compels a finding that Passalaqua controlled the funds in the Prior2IPO Consulting LLC Accounts such that he should be required to forfeit the full amount of proceeds that moved through those accounts. Passalaqua had a 51% ownership interest in Prior2IPO Consulting,[18] and he was the CEO of the company. He was also a signer on the Prior2IPO Consulting LLC Accounts that received proceeds from Valeo. He exercised control over the money that moved through those accounts and used some of those funds for his personal expenses. See Ex. C at 4. Accordingly, consideration of the Peters factors warrants a finding that proceeds held in the Prior2IPO Consulting LLC Accounts were under his control such that he should be required to forfeit them.

For these reasons, the government submits that Pirrello shall be required to forfeit $77,688,200 and Passalaqua be required to forfeit $11,127,447.

---

[17] Another individual who served as the Chief Marketing Officer of Prior2IPO Consulting LLC was a co-signer on two of these accounts.

[18] See EDNY_00068379 at 2 (U.S. Small Business Administration loan application for Prior2IPO Consulting LLC listing Passalaqua as 51% owner of the company).

CONCLUSION

For the reasons set forth above, the government respectfully submits that the Court calculate the applicable Guidelines range and order restitution and forfeiture as set forth above.

Dated: Brooklyn, New York
October 5, 2026

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York

/s/
Jessica K. Weigel
James R. Simmons
Assistant U.S. Attorneys
(718) 254-7000

Cc: Clerk of the Court (KAM)
Defense counsel (by ECF)