MCF

Michael C. Farkas, Esq., PLLC

P: 212.760.8400 • F: 212.760.8403 • E: mfarkas@farkaslawfirm.com

32 Court Street, Suite 408
Brooklyn, New York 11201

546 5th Avenue, 6th Floor
New York, New York 10036

October 13, 2026

Via ECF

Hon. Kiyo A. Matsumoto
U.S. District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Re: United States v. Pirrello, et. al.
23-cr-499

Your Honor:

In accordance with the Court's Order dated October 5, 2026, please accept this letter as Defendants Raymond J. Pirrello's and Joseph Passalaqua's supplemental submission opposing the Government's Memorandum of Law dated October 5, 2026.

The Government in its *Fatico* submission avers that the victims in this matter suffered actual losses in an amount of approximately $88 million under both USSG §2B1.1 and the Mandatory Victims Restitution Act, 18 USC §3663A ("MVRA"). The Government further argues that almost the same total be assessed as forfeiture against Defendants, with $77,688,200 relating to Pirrello and $11,127,447 relating to Passalaqua. We note that at Passalaqua's plea hearing, the Government stated on the record that it will "be obligated to prove by a preponderance our estimate of approximately $7.4 million." Plea Hearing Tr. 17:8-14, Ex. B to Government's Submissions.

As an initial matter, Defendants bear no burden to establish an alternative loss amount. The burden rests squarely with the Government. *United States v. O'Sullivan*, 2023 WL 4209611, at *1 (EDNY June 26, 2023); *United States v. Cuti*, 2011 WL 3585988, at *4 (SDNY July 29, 2011); *United States v. Gushlak*, 2011 WL 3159170, at *3 (EDNY July 26, 2011) ("The government bears the burden of proving the amount of loss sustained by the victim by a preponderance of the evidence" (citations omitted)). Nevertheless, as set forth below, the evidence supports a loss amount of zero—or, at a minimum, an amount far below the Government's asserted $88 million.

## I. Preliminary Statement

The Government bases its theory of actual loss upon Defendants' admitted misrepresentation to investors relating to their upfront compensation. The Government

posits that this, "led [the investors] to believe that all their invested capital was used to purchase stock . . . instead of being used to purchase shares on behalf of investors." (Gov't Memo, pgs. 7-8). The only precedent cited for this proposition is another "pre-IPO" fraud case recently tried in the Southern District, *United States v. Castillero*, No. 23-CR-622 (JMF) (SDNY). The Government then proffers a "flow of funds" analysis that claims to summarize, "irrefutable financial records that reflect $88 million of investor funds flowing into accounts controlled by Pirrello and Passalaqua and other coconspirators instead of being used to purchase pre-IPO shares." (Gov't Memo, p. 13).

The Government's theory of "actual" loss, as well as its calculation methodology, are flawed for purposes of establishing loss under USSG §2B1.1 and the MVRA. Additionally, the Government's position with regard to forfeiture improperly seeks to go beyond Defendants' personal gains.

The Defense believes that the Government has misunderstood the larger context of this matter from the beginning. Unlike the other pre-IPO cases that were extensively litigated in the Southern District (*Castillero, supra* and a related prosecution, *United States v. Gogliormella*, 24-CR-362 (JMF) (SDNY)), Defendants and their main co-conspirators here did not simply acquire shares at a lower price, turn them around and sell them at higher prices, and fund their operations and personal profits with investor money. Mr. Pirrello's co-conspirator "partners," identified as Co-Conspirators 1 and 2 in the indictment, had been operating since approximately 2010 when Mr. Pirrello joined them in 2016 to build a marketing operation for their fund. During those previous years and continuing thereafter, Co-Conspirator 2 and Capital Truth built an inventory of pre-IPO shares that required large financial commitments and entailed high risks. Capital Truth had to continuously pay the heavy fees and expenses associated with the acquisition and maintenance of those positions, which remains true to this day. On many occasions and for substantial amounts of time, the main co-conspirators lost significant sums of money due to failed pre-IPO positions, cancelled forward contracts, refunds to investors when certain positions became devalued, high fees associated with maintaining inventory; and even shortfalls of cash needed to pay the sales agents, which had to be covered by personal loans from one or more of the controlling co-conspirators. Notably with regard to maintenance-type fees, Capital Truth and Co-Conspirator 2 ceased charging the fund and its investors to recoup such fees after Mr. Pirrello began working with them, at his direction.

Over many years, Capital Truth sold shares in its inventory to Late Stage, for sale to investors. The Government rushed to simplify the spread between Capital Truth's acquisition prices and the prices that Late Stage paid for them, as if they had simply purchased them and marked them up for quick re-sale. The Government assumed this was the same situation as in the other cases without any examination of the long history of risks undertaken by Capital Truth with regard to those positions; the heavy costs and expenses incurred relating to them, such as accounting, legal, salary, and marketing costs, well beyond any payments to a sales force; and, perhaps most importantly for purposes of the upcoming *Fatico* hearing, the fairness of the valuations they wanted to provide, which resulted from the risks and financial burdens carried by Capital Truth over this long time period. The Government seems to have only scrutinized four bank accounts controlled by the owner of Capital Truth, which Mr. Pirrello believes to afford only a limited glimpse into Capital Truth's history.

To be clear, Defendants committed a crime when they and/or the sales agents under their direction misled investors to believe that no upfront compensation was being earned. Such misrepresentations created the false impression that the salespeople and the investors shared the risks of the investments – a material data point for consideration whether or not to invest. Defendants should not have made these misrepresentations and should have been more professionally diligent in making proper disclosures to both the sales agents and to prospective investors.

They did not, however, believe that they were selling securities at unfair prices, or that the companies underpinning those investments were poor risks, or that they would not be able to deliver shares as required when companies went public. They did, however, believe that they had eliminated the traditional fees commonly charged to investors by brokerage firms and investment funds, although they were not diligent enough to equate undisclosed compensation with a type of "fee."

It is worthwhile to note that of the approximate $859 million in pre-IPO share sales raised by Late Stage, Defendants' combined personal gains approximated only 1.6% of that total, and the net gains by investors whose companies went public appear to be over approximately $200 million (without including the recent SpaceX IPO, which will be distributed in the near future). Additionally, the owners of the fund entities were not indicted in this case, despite clear evidence they engaged in similar conduct attributed to Mr. Pirrello. Such facts are not consistent with the characterization of a wholly illegal enterprise imposing $88 million in losses upon its investors.

Much of the foregoing will be presented in Defendants' sentencing submissions. For purposes of the upcoming *Fatico* hearing, Defendants present the following:

First, the Government's loss theory completely fails to account for the "actual value of the instruments" under *United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008) and its progeny, by foregoing even the idea of determining the value of the pre-IPO shares or refuting that any decrease in value since their purchase was caused by factors unrelated to the fraud. Similarly, the Government maintains its erroneous understanding of "markups" as that term is legally defined, which further illustrates the Government's faulty premise.

Second, the Government's "flow of funds" methodology also does not account for the actual value of the investments, or analyze the investments at all. The Government's methodology is limited to tracking money flowing between the fund entities and then to Defendants and the sales agents, without regard for what markups did or did not legally exist, and without considering the enormous financial commitments and risks that Capital Truth undertook during the relevant period, which inured to the benefit of the investors. Further, from the Government's description of its analysis, non-investor funds of over $8 million do not appear to have been deducted from the Government's calculations.

Third, the Government has not presented sufficient evidence that the investors relied upon Defendants' misrepresentations relating to up front compensation. Defendants have not conceded that the "more than 5000" investors in this matter relied upon those misrepresentations. (Gov't Memo, p. 14). Reliance is particularly important in a case where the misrepresentations are not based on the market pricing of the security or the viability of the underlying concern, thereby making it plausible that some of the investors

would have invested even with full knowledge of Defendants' compensation. While Defendants are guilty of the charged offenses because their misrepresentations were material to investors' decisions whether or not to invest, such materiality does not equate to reliance by over 5000 investors, especially when determining the loss amount. In addition, evidence of investor reliance does not resolve whether the Government's calculation adequately accounts for the underlying value and legitimate activities of the fund entities. The entities possessed legitimate assets, conducted legitimate business, and generated value independent of the alleged misrepresentations. Those circumstances warrant consideration in determining whether the Government's proposed calculation accurately measures the pecuniary harm resulting from the offense.

With regard to the Government's contention relating to Mr. Pirrello's alleged obstruction of justice, we reserve argument on this point as the upcoming *Fatico* hearing relates only to loss, restitution and forfeiture. However, Mr. Pirrello will continue to confer with the Government in this regard and notify the Court of any dispute prior to sentencing.

Finally, with regard to forfeiture, the Government takes the position that the total amount of money that passed through Defendants' entities should be forfeited, as opposed to only the amounts they retained for personal use – even though the Government has already calculated what it represents to be each Defendants' personal gains (Gov't Memo, Ex C pgs. 3-4). The Government's "control" theory is invalid as a matter of law, as it does not account for the direct costs incurred in providing services contemplated under 18 USC §981(a)(2)(B), such as the compensation of the sales agents, which the Government also establishes in its calculation. Additionally, such a forfeiture theory was rejected in substantially similar circumstances in the *Castillero* and *Gogliormella* cases.

## II. Discussion

### A. <u>The Government's loss theory fails to account for actual value</u>

The Government's loss theory fails to account for the actual value of the instruments underlying the fraud at the times they were sold to the investors. As a result, it cannot suffice to establish actual loss, as the securities held inherent value that may have equaled or surpassed their sales prices. Further, because any decline in value after the times of the sales (if any occurred at all) was unrelated to any fraudulent activity, the focus of the actual valuation analysis must remain on the times of the sales. Moreover, by failing to properly establish actual loss, the Government cannot shift the burden to the Defense.

In *United States v. Leonard*, *supra*, the Second Circuit considered a case involving the failure to accurately disclose sales commissions. In that matter, "[t]he district court computed the loss amount as equal to the entire cost of the securities sold by the appellants, on the ground that the members would not have invested had they realized the true size of the sales commissions." *Id.* at 93. Restitution in that same amount was also ordered against one of the defendants. In vacating the sentences, the Second Circuit held as follows:

> Although we defer to the district court's determination that the members would not have purchased the investment had they known that 45% of the sales price went toward commissions, this does not, in and of itself, mean that the securities the investors received in

> exchange for their contributions were entirely without value. After all, the investors did obtain an interest in a company engaged in producing and distributing a motion picture. Accordingly, the district court erred in not deducting from the purchase price the actual value of the instruments.
>
> *Id.*

The Court also noted that it was, "mindful that illiquid securities for which there is no public market can be extremely difficult to value. Determination of the extent to which the misrepresentations here resulted in an overvaluation of the securities 'cannot be an exact science,' and we can only call on the district court to make a 'reasonable estimate' of the loss amount." *Id.* (citing *United States v. Rutkoske,* 506 F.3d 170, 179 (2d Cir. 2007) and USSG §2F1.1 cmt. n.9 (2000)).

In the case at bar, the Government does not allege that the "entire cost of the securities" (i.e., approximately $859 million) is the loss amount, as it did in *Leonard*. The Government must still, however, account for the actual value of the instruments in comparison to the Government's assertion of loss. To do this, the focus must be on the pre-IPO share sales to the investors, because nothing relating to the fraud after those times effected the shares' market values.

*Rutkoske*, a Second Circuit case, is instructive in this regard. First, citing *United States v. Ebbers*, 458 F.3d 110, 128 (2d Cir. 2006), the Second Circuit in *Rutkoske*, "acknowledged the complexities inherent in calculating the loss amount but emphasized that '[t]he loss must be the result of the fraud,'" and, "[m]any factors may cause a decline in share price between the time of the fraud and the revelation of the fraud . . . . In such cases, '[l]osses from causes other than the fraud must be excluded from the loss calculation.'" *Id.* at 179. The Court then referenced the Fifth Circuit decision in *United States v. Olis*, 429 F.3d 540 (5th Cir. 2005), "a case cited approvingly in *Ebbers,* 458 F.3d at 128," as follows:

> Applying the teaching of the Supreme Court in *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 125 S. Ct. 1627, 161 L. Ed. 2d 577 (2005), the Fifth Circuit stated that "there is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines" and that the portion of a price decline caused by other factors must be excluded from the loss calculation. *See Olis*, 429 F.3d at 546; *see also United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes.").
>
> *Rutkoske*, 506 F.3d at 179.

Rejecting the Government's contention that principles set forth in a civil case, "should not apply to loss calculation in a criminal case," *Rutkoske* went on to further cite the U.S. Supreme Court in *Dura Pharmaceuticals* as follows:

> There, the Supreme Court rejected the Ninth Circuit's "inflated purchase price" theory of loss causation, which held that plaintiffs in a civil stock fraud case could establish loss causation simply by showing that the purchase price was inflated because of the defendants' misrepresentation. *See* 544 U.S. at 340. In rejecting this theory, the Court observed that although an artificially inflated price might cause an investor's loss when the investor sells his shares "after the truth makes its way into the marketplace," *id.* at 342, other factors, such as changed economic conditions, might also contribute to a stock's decline in price, *see id.* at 343, and a plaintiff must prove that the misrepresentation proximately caused the economic loss, *see id.* at 346.
>
> *Rutkoske*, 506 F.3d at 179.

The instant case involves misrepresentations limited only to Defendants' compensation, which the Government contends resulted in share-price inflation. The Government does not contend, however, that Defendants' misrepresentations bore upon the market valuation of the share prices or the viability of the companies underlying the share interests. As a result, there could not possibly be, nor was there any "truth" relating to those misrepresentations that was, "subsequently revealed" and caused any effect, positive or negative, in the share prices relating to those companies. *Rutkoske*, 506 F.3d at 179, *citing Olis, supra* at 546. For this reason, any change in the pre-IPO securities' value after the times of purchase, whether or not the underlying companies went public, was unrelated to the fraud in this case. *Cf. United States v. Finzarro*, 850 F.3d 94, 118-119 (2d Cir. 2017) (while the key loss issue involved whether the defendant's gain directly correlated to the victim's loss, the Court noted, "it is not a sufficiently sound methodology for the district court to merely assume that the kickbacks were *solely* justified by inflated prices. Instead, the district court must employ a methodology to determine whether the entirety of Finazzo's kickbacks was solely derived from activity that caused loss . . . ."). The actual value of those instruments at the times of their purchase, therefore – not at any other time – must be determined if reasonably possible and subtracted from the loss amount.

In other words, because any change in valuation of the pre-IPO shares after they were sold to the investors in this matter would have been unrelated to any fraudulent conduct, the shares' value at the times of their sales is what must be deducted from the Government's assessment of actual loss. The Government, however, has not engaged in any effort to determine such valuation, as it is required to do.

The Government, not the defense, bears the burden of establishing loss and accounting for actual value. This requires the Government to engage in exactly the type of complex analysis that it chose to forego in this case, despite its claim that it, "does not have sufficient information based on Late Stage's books and records to determine the cost basis for each investment," and that, "[f]urther precision is impracticable here and not required by the law." (Gov't Memo, p. 16). No "cost basis" data is necessary to begin to examine the value of the investments at the times of purchase – all that is needed are the sales prices. Likewise, an examination of market conditions at the times of purchase is certainly not "impractical." Thus, although loss amount need not be calculated with precision, the Government must do more than it has done in this case.

The Second Circuit in *Unites States v. Gushlak*, 728 F.3d 184 (2d Cir. 2013) provides a helpful example of how the Government should have engaged in a more diligent valuation analysis in the case at bar. *Gushlak* involved a "pump and dump" scheme, where the actual losses for purposes of restitution were challenged by the defendant. The Court recognized that, "[t]he challenge, often daunting, is to determine if and to what extent particular investors have been harmed by artificial prices that are the result of deliberate misinformation of one sort or another (including manipulative trading practices designed to inflate the price)," *id.* at 196, and also cited the Supreme Court for the proposition that, "as a matter of pure logic, at the moment the transaction takes place, the [investor who paid the inflated price] has suffered no loss; the inflated purchase payment is offset by ownership of a share that at that instant possesses equivalent value." *Dura Pharmaceuticals*, 544 U.S. at 342. The Court continued,

> To quantify investor losses in this manner, one needs to determine what the aggregate price of the investor's shares would have been on a given date but for the fraud; this value can then be subtracted from the actual market price of the shares on that date. *Green v. Occidental Petroleum Corp.*, 541 F.2d 1335, 1344 (9th Cir. 1976) (Sneed, J., concurring). This disentangles those elements of a stock price that are a result of legitimate factors from those that are the result of fraudulent ones. Although performing the task may be a challenge in any particular case, as a general matter, it is necessary to a determination whether particular losses were "directly and proximately" caused by fraud, or instead by the materialization of some non-fraud risk, against which investors are not protected by the securities laws. *See United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) ("[T]he court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes."); *see also United States v. Rutkoske*, 506 F.3d 170, 178-79 (2d Cir. 2007).
>
> *Gushlak*, 728 F.3d at 197.

The *Gushlak* court further explained that the facts in that case, like here, indicated "that this was not a relatively simple situation in which the fraudulent conduct at issue was revealed all at once, such that one could observe the market's immediate response to a disclosure in order to quantify victims' losses. *Rutkoske*, 506 F.3d at 179 (describing similar circumstances)." *Id*. at 198.[1] To meet its burden to establish valuation during the relevant period, in addition to, "Gushlak's allocution and affidavits filed with the government's fourth restitution submission," the Court considered the following:

[1] Beyond the fact that *Gushlak* involved a factual scenario where the disclosure of the fraudulent conduct did not reveal the market's response, it then differed from the case at bar in that, "[i]t appears instead to be a case where the inflationary (fraud-induced) component fell out of the price gradually, as the result of cessation of manipulative conduct, an increasing awareness in the market that GBNE's price was inflated, and perhaps even broader market forces." *Gushlak*, 728 F.3d at 198. This difference, however, is not relevant to the issues before the Court herein.

> The balance of the district court's findings were drawn from the expert report and testimony of [the Government's expert] DeRosa. His analysis was an attempt to do what we have described above. He sought to calculate the "fair market price" of GBNE during the period in which the price had been manipulated. . . . This "fair market price" – essentially, what the price would have been "'but for' the price manipulation," could then be compared to GBNE's actual closing price to isolate the so-called "inflationary component" of the price – that part of the price that was the result of fraud.
>
> *Gushlak*, 728 F.3d at 198 (citations omitted).

Once the government's expert analysis was presented, the *Gushlak* court ruled as follows:

> We are persuaded, as was the district court, that this showing established by a preponderance of the evidence a reasonable estimate of loss founded on a sound basis for approximation. Calculating loss amounts in this case, as already noted, was a vexing task, because although the evidence demonstrated that GBNE's stock price was plainly, vastly inflated, the manner in which its inflationary component dissipated was halting and gradual….
>
> Confronted with this difficulty, the government was forced to explain in a somewhat more general manner the price that one would have expected GBNE to have traded at absent fraud, quantifying the inflationary component by comparing that fair market price to the actual closing price. It relied, as is customary – indeed, necessary – in cases like this, on the testimony of a well-qualified expert. . . .
>
> In sum, the district court credited the government expert's well-supported proffer of a widely accepted methodology, trained towards a logical measure of loss, and tailored to the particular circumstances of this case. We therefore conclude that, in the circumstances of this case, the government carried its burden under the MVRA.

The Government's task in *Gushlak* was no less challenging than what should be required at a minimum in this case, where the Government is not confronted with the "daunting" task of trying to quantify dissipating effects of fraudulent conduct that may or may not have impacted valuation over a period of time. Here, the Government could have and should have examined secondary market data to determine, if reasonably possible, the values of the investments at the times of their sales, and how those values compare to what it now claims to be the actual loss.

By ignoring *Leonard's* established precedent and presenting only a general "flow of funds" analysis, therefore, the Government has failed to meet its burden.[2]

[2] Such burden cannot be shifted to the defense. The *Gushlak* court properly ruled that it was not until after the Government met its burden by proffering the aforementioned comprehensive market analysis, that "[i]t therefore fell to Gushlak to undermine this showing if he could." *Id*. at 201. The Court rejected Gushlak's

1. *The Defense's subpoenas help to further demonstrate the Government's failure to meet its burden*

As the Court is aware, the Defense issued a series of subpoenas to what appeared to be entities making a secondary market in pre-IPO securities during the relevant time frame. The Defense did not undertake such exercise to assume the Government's burden under *Leonard*, *Rutkoske* and their progeny, but to demonstrate, first to the Government, and, now, to the Court, that engaging in a market valuation analysis is both reasonably practical and necessary in a case such as this.

As described by the Defense's expert, Professor Kumar Venkataraman, these marketplaces provide platforms, "where accredited investors can get access to pre-IPO shares"; they include, "Forge Global, EquityZen, and NASDAQ Private Markets."

An examination of the market data received from these subpoena recipients does not yet lead to firm conclusions, but provides support for the premise that market valuation should have been taken more into account by the Government.[3] In one example, records from Forge Global, Inc. (Forge) indicate that on February 8, 2019 its platform facilitated a closed transaction between a retail seller and an institutional buyer for 4,242 pre-IPO shares of Airbnb at a cost of $487,830, equating to $115 per share (also note that Forge charged a commission on that transaction of $24,391.50). According to discovery material provided by the Government in advance of the *Fatico* hearing, a Late Stage investor purchased 674 shares of Airbnb for $48,865.00 that same day (February 8, 2019) at a per-share cost of $72.50. Additionally, six other Late Stage investors appear to have purchased Airbnb in January of 2019 at prices between $62.50 and $72.50 per share. Likewise, another Late Stage investor purchased Airbnb shares later in February 2019 for $70.

In another example, records from Forge indicate that on April 24, 2020, its platform facilitated two closed transactions: one between a retail seller and an institutional buyer for 4,000 pre-IPO shares of Impossible Foods at a cost of $108,000 equating to $27 per share, and one between a retail seller and a retail buyer for 3510 shares at a cost of $100,035 equating to $28.50 per share (commissions were charged on those transactions as well). During that month (April 2020), the records appear to indicate that six Late Stage investors paid between $19 and $25 for their shares of Impossible Foods. Three investors in the previous month (March 2020), however, paid $35 (one investor) and $38 per share (two investors).

---

attempted challenge, noting, "Gushlak's insistence on a more fine-grained approach is not, as an abstract matter, altogether unreasonable. It has apparently become standard operating procedure in federal securities litigation to conduct a so-called 'event study' when attempting to establish or quantify the effects of fraud on a stock's market price," however, "[w]e do not think that DeRosa's failure to conduct such a study is a fatal flaw in his analysis." *Id*. Thus, the Court ruled, "the district court had a factual basis for concluding that there were no company-specific disclosures concerning non-fraudulent information that would have affected GlobalNet's stock price. . . . In other words, it found that the only relevant company-specific factor was fraud. We do not think this finding, grounded in the record before the district court, is clearly erroneous." *Id*. at 202.

[3] The subpoenaed entities did not have data relating to every company to which the Government refers in its consideration of loss (*see* Gov't letter dated June 11, 2026, ECF Dkt. No.156), nor did their data cover varying portions of the relevant time periods involved in this case. The Defense reiterates that it falls upon the Government to undertake a sufficient investigation and analysis in this regard, to include expanding such an inquiry to additional market makers and methods of valuation, all of which it failed to do.

In March and April of 2021, twenty five Late Stage investors appear to have paid $125 per share for Instacart. Records from EquityZen Securities LLC (EquityZen) indicate that it facilitated closed transactions on March 9, 2021 for 250 shares at $125 per share, at a cost of $31,250 (with a $3,125 fee); on March 10, 2021 for 500 shares at $205 per share, at a cost of $102,500 (with a $10,250 fee); on April 15, 2021 for 1,595 shares at $199 per share, at a cost of $317,405 (with a $31,741 fee); and on April 20, 2021 for 650 shares at $180 per share, at a cost of $117,000 (with a $11,700 fee).

In October of 2021, fifteen Late Stage investors appear to have paid between $2 and $3 for Addepar pre-IPO shares. Records from EquityZen indicate that it facilitated closed transactions on October 5, 2020 for 8,298 shares at $3 per share, at a cost of $24,894 (with a $2,489 fee); on October 8, 2020 for 38,096 shares at $1.13 per share, at a cost of $43,048 (with a $4,305 fee); and on October 22, 2020 for 4.083 shares at $2.95 per share, at a cost of $12,045 (with a $1,204 fee). Demonstrating the volatility and variability in pricing, during the prior month (September 2020) EquityZen recorded five closed transactions at $1.16, $0.75, $1.16, $1.85 and $1.15 per share while Late Stage investors appear to have paid between $1.50 and $2.50 per share; in the following month (November 2020), EquityZen recorded three closed transactions at $1.13, $4.05, and $2 per share while Late Stage investors paid between $2 and $3.

The Defense does not suggest that a comprehensive valuation analysis is a straightforward exercise, nor do we believe that the subpoenaed data suffices to establish firm conclusions as of yet, other than the fact that losses are simply not being properly calculated. Many complex variables must be taken into consideration together with the available secondary market data. This presents challenges that demand significant expertise, time, and expense to properly distill and present. The Second Circuit recognized as much in stating, "[t]his sort of quantitative analysis, relying as it does on sophisticated principles of corporate finance and statistics, is hardly the stuff of ordinary judicial expertise. Courts therefore can and ordinarily do rely on the testimony of one or more experts for one side to establish a statistical model, and one or more on the other side to bring to the court's attention the ways in which that model may be unsound, and, if necessary, propose a viable alternative. *See Rutkoske, 506 F.3d at 180* ('Normally, expert opinion and some consideration of the market in general and relevant segments in particular will enable a sentencing judge to approximate the extent of loss caused by a defendant's fraud.')." *Gushlak*, 782 F.3d at 197.

While some examples may be clear cut, as when Late Stage investors appear to have paid less than customers of established pre-IPO market makers during a given time period, others are not, as when the investors may have paid more than some market makers' transaction prices. In the latter instance, factors that must be analyzed before simply concluding that a principal is responsible for an entirety of loss include the differing sizes of the comparable transactions, the costs associated with purchasing from marketplaces such as Forge and EquityZen, accessibility (or lack thereof) to the marketplace for each different pre-IPO company's shares, the anticipated and reported values of the underlying company, investor demand, restrictions on potential transfers of the shares, and the costs and risks assumed by the principal.

These examples illustrate, however, the necessity and viability of the task for the party that bears the burden of proof – the Government. The mere existence of examples such as these

indicates that the full amount of the Government's loss calculation against the Defendants should not be imposed on the evidence presented.

2. *The Defense's continuing efforts to properly define "markups" also demonstrate the Government's failure to meet its burden*

In addition to sharing the subpoenaed data with the Government, the Defense has also repeatedly discussed with the Government the proper legal definition of a "markup" and how market valuation critically relates to this case. The Defense notes that it has not only provided the Government with legal support in this regard,[4] but that the Defense's position

[4] The defense has made its legal presentation on the proper definition of a "markup" on several prior occasions, including in its now-moot Opposition to the Government's Motions in Limine (docket entry 141, Point E) and in its *ex parte* subpoena applications. For this reason, we reiterate that presentation now only by footnote:

In general, "a 'mark-up' is the difference between the price charged to a customer for a security by a broker-dealer acting as a principal (including riskless principal transactions) and that security's 'prevailing market price.'" Harvard John M. Olin Discussion Paper Series, *The Law And Finance Of Broker-Dealer Mark-Ups*, Pg. 4, April 6, 2011, citing *Press v. Chemical Inv. Svcs. Corp.*, 166 F.3d 529 (2d Cir. 1999). Further, in discussing the possible "excessiveness" of a mark-up, the Second Circuit explains, "the determination of excessiveness is to be done on a case-by-case basis, and a markup is excessive 'when it bears no reasonable relation to the prevailing market price.'" *Press*, 166 F.3d 529 (*Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 190 (2d Cir. 1998) (*quoting Bank of Lexington & Trust Co. v. Vining-Sparks Secs., Inc.*, 959 F.2d 606, 613 (6th Cir. 1992))). In the instant case, Defendants are obviously not registered securities broker dealers. While the Government and Defense will likely disagree as to technical points such as whether Defendants were acting as broker dealers, and whether Late Stage and or Capital Truth Holdings was making a market in these pre-IPO securities, the proper measure of whether Defendants materially misrepresented the nature of any alleged mark-ups will turn upon the question of whether such markups were "excessive" based on the "prevailing market price" of the securities at the times they were sold.

The Government has taken this same position in similar cases. In *U.S. v. Castillero, et. al.,* 23 CR 622 (JMF) (SDNY), a recently sentenced case involving another pre-IPO fund called "StraightPath," the Government called an expert witness at trial in October 2025 to explain the operative definition of "mark-ups" as well as the guidance and limitations placed on them by the securities industry, specifically the SEC and FINRA. Notably, the government also noticed the same expert in another pending EDNY pre-IPO prosecution, *U.S. v. John Cangialosi, et. al.*, 24 CR 363 (CBA): Professor Arthur Laby, Esq. In his testimony in the *Castillero* matter, which, again, involved similar allegations of fraudulent misrepresentations as to "mark-ups" in the sale of pre-IPO securities, Prof. Laby explained as follows:

- A markup is generally defined as the price that the seller of a security charges above the prevailing market rate, if a prevailing market price can be determined under the circumstances
- Sometimes, there is a question as to how to determine the prevailing market rate
- FINRA guidance states generally that a markup should not exceed 5% of the prevailing market rate, and there are other factors that FINRA cites to help determine what is reasonable under the circumstances
- The SEC maintains a rule stating that markups must be limited to 10% unless they are fully disclosed

Moreover, in each pre-IPO case in both districts (including ours), the Government has invoked SEC policy considering undisclosed markups of greater than 10% as being *per se* fraudulent. Said policy is summarized by NASD Notice to Members 87-31, which states in its Summary of the SEC's Release on this subject, "The SEC further states that it has consistently held that mark-ups in excess of 10 percent above the *prevailing market price* are fraudulent. . . .", and in its Discussion (section II[A]), "To determine the mark-up charged

is now also supported by the Defense's expert, Prof. Kumar Venkataraman, who *actually testified for the Government in the Castillero trial*.[5]

More specifically, the Defense has attempted to explain how the instant case in many ways is similar to, but in other important ways differs significantly from the two heavily litigated *Castillero* and *Gogliormella* pre-IPO cases in the Southern District, particularly with regard to the valuation question. Importantly, in both SDNY cases, there was no serious question as to the potential market valuation of the pre-IPO securities. The Government, and later the Court, adopted the average cost-bases of those securities (i.e., the prices at which the StraightPath and related funds acquired their shares) as the market valuation for purposes of defining and calculating the markups concealed from their investors. While one of the defendants in those cases did briefly argue that the Government should first be held to its burden to establish or attempt to establish valuation under *Leonard*, none of the other arguments or cases cited herein were mentioned. *See*, Martinsen Sent. Mem. at pgs. 20-21, *Castillero*, *supra*, ECF Dkt. No. 213. Additionally, no defendant in those cases issued subpoenas such as those pursued by Mr. Pirrello, nor did they have a reasonable basis to suggest that any valuations beyond the pre-IPO shares' cost-bases could be determined.

It is also interesting to note how the Government so quickly cites the *Castillero* matter as the sole persuasive authority for the points that it supports, while at the same time employing an entirely contradictory theory with regard to forfeiture. This observation will be more fully examined below.

Regardless of the determinations in those other pre-IPO matters, however, the Government has not met its burden to prove actual loss herein under *Leonard*, *Rutkoske* and their progeny. Accordingly, the loss amount under USSG §2B1.1 must be determined to equal zero as a matter of law.

B. <u>The Government's "flow of funds" methodology fails to reasonably estimate loss</u>

Exhibit C to the Government's submission purports to show, "$88 million of investor funds flowing into accounts controlled by Pirrello and Passalaqua and other coconspirators instead of being used to purchase pre-IPO shares." (Gov't Memo, p. 13). As previously argued, this methodology does not represent any effort to comply with *Leonard's* valuation

---

to the customer, the broker-dealer must determine the '*prevailing market price*.' The dealer mark-up equals the price charged to the customer minus the *prevailing market price*. The proper method for determining the prevailing market price for a security, however, is often the major contested issue in markup cases." (emphasis added) (citations omitted].

[5] The relevant excerpt from Prof. Venkataraman's disclosure reads as follows: "A "markup" is a type of fee that is generally the difference between the price charged to a customer for a security by an intermediary, such as a broker-dealer, and that security's prevailing market price, if one can be determined. The proper method for determining the prevailing market price for a security is often a major contested issue. When it is not reasonably possible to determine a prevailing market price, it may be appropriate to deem the intermediary's purchase price as the prevailing market price for purposes of calculating the "markup." The questions of how and whether a prevailing market price can be determined, however, should be addressed before using an intermediary's purchase price to be the starting point for a markup analysis.

requirement, and it does not represent a sufficient alternative to the type of analysis performed in *Gushlak*. For the same reasons as argued above, it should be rejected.

Likewise, the Government's methodology does not seek to determine whether any actual markups existed, even though the sum total of such markups are what the Government alleges to have improperly inflated the investors' purchase prices. The Government is required to either establish the prevailing market prices of the securities at the times of their sales, or demonstrate why doing so is not reasonably possible. In doing neither, it cannot establish actual valuation or the existence of markups at all. The result leads us back to the *Leonard* violation, as well as the basic proposition that the Defendants cannot be held responsible for alleged price inflation due to markups that have not been proven.

The Government's methodology also does not give necessary consideration to the risks and costs borne by Capital Truth before and throughout the relevant period, which enabled it to sell what it believed to be market-valued securities to Late Stage over long periods of time without passing along the huge costs of doing so to the investors. By limiting its analysis in this manner, the Government does not capture the value provided to the Late Stage investors – it leaves the impression that investor money was "diverted" from purchases of additional shares, when no such additional purchases were warranted.

Finally, the Government's analysis does not seem to account for over $8 million in *non-investor funds* that was received by Capital Truth. In Exhibit C to the Government's submission, Item [2] (a white square entitled, "Other") references, "Excludes returns." This appears to indicate that $8,857,663 was received by Capital Truth from sources other than the Late Stage investors, which the Government is somehow excluding from its calculations. If so, the Government cannot claim that the entire amount of funds sent by Capital Truth to the sales agents comprised investor funds, or, consequently, investor losses.

C. <u>The Government has not presented sufficient evidence of reliance</u>

The Government seems to argue that the "more than 5000" investors relied upon Defendants' misrepresentation that they, "only made money if the victim-investors made money, and that there would be no upfront fees. . . ." (Gov't Memo, p. 14). There is a distinct difference, however, between establishing that a misrepresentation is "material" to a decision to invest and that such misrepresentation was relied upon to invest. Defendants concede the materiality of their misrepresentations, but not that all or most of the investors relied upon those misrepresentations when choosing to invest.[6]

[6] The Government states that, "Pirrello and Passalaqua admitted under oath at their guilty pleas" that their representations, "were, in fact, relied upon by the investors when choosing to invest in Late Stage." (Gov't Memo, pgs. 14-15). Mr. Pirrello made no such admission during his plea allocution. Mr. Passalaqua stated, "Yes, Yes, Your Honor," in response to the Court's question, "And based on those material misrepresentations, to your knowledge, did investors rely on that misrepresentation and then invest with your -- as a result of the scheme and transfer of money to Late Stage?" (Gov't Memo, Ex B, Tr. p. 28). This was not a blanket statement tantamount to conceding reliance by over 5000 investors. Evidence of investor reliance does not resolve whether the Government's calculation adequately accounts for the underlying value and legitimate activities of the fund entities. The entities possessed legitimate assets, conducted legitimate business, and generated value independent of the alleged misrepresentations. Those circumstances warrant consideration in determining whether the Government's proposed calculation accurately measures the pecuniary harm resulting from the offense.

Defendants' misrepresentations were not related to the fair pricing of the securities at the time of sale or the viability of the underlying companies themselves. The pre-IPO securities being offered by Late Stage, moreover, were in high demand. While it is reasonable to believe that some investors relied upon the conspirators' statements relating to upfront compensation when deciding to invest, it is also entirely plausible that many did not.

> As we see it, the government may show reliance in a securities fraud case either through direct evidence or specific circumstantial evidence. The government may of course introduce individualized evidence of reliance—that is, direct evidence that each individual investor read the false information and relied on it when deciding to purchase stock. *See United States v. Ebbers*, 458 F.3d 110, 126–27 (2d Cir. 2006) (recognizing that reliance can be shown for loss calculation purposes under §2B1.1 by offering evidence to demonstrate express reliance on the accuracy of the [fraudulent] financial statements) (quotation marks omitted). But, as the district court aptly recognized, requiring individualized proof of reliance for each investor is often infeasible or impossible. *[citations omitted]*. Thus, in cases such as this one involving numerous investors, the government may instead offer specific circumstantial evidence from which the district court may reasonably conclude that all of the investors relied on the defendant's fraudulent information. *United States v. Stein*, 846 F.3d 1135, 1153-1154 (11 Cir. 2017).

In *United States v. Archer*, 671 F.3d 149, 172 (2d Cir. 2011), the Second Circuit stated in a restitution context, "[i]n some cases, it will be clear that no reasonable person would have given the defendant her money if she had known of his plan—as in the fraud in [*United States v.*] *Ojeikere* where the defendant's plan was to abscond with his co-conspirators' funds as soon as he got hold of their money." *Id.* (citing *United States v. Ojeikere*, 545 F.3d 220, 223 (2d Cir. 2008); *see also United States v. Marino*, 654 F.3d 310 (2d Cir. 2011). The Second Circuit continues: "In those cases, a generalized description of the fraudulent scheme is enough to support restitution. But where it is plausible that some individuals would have paid the defendant even if they had been informed of his fraudulent plan, then the government must proffer some individualized evidence to meet its burden of showing that each alleged 'victim' was actually a victim." *Archer*, 671 F.3d at 172; *Cf. United States v. Gonzalez*, 647 F.3d 41, 65–67 (2d Cir. 2011) (vacating a restitution award where the district court failed to calculate individualized and actual losses).

The Defense believes that many of the Late Stage investors would have invested even if they had known that their sales agents were receiving compensation. Likewise, the Defense believes that these same investors would have invested even if they knew that cost spreads, which may or may not have been properly defined as "markups" due to the fair valuations that the investors believed they were getting, existed and resulted in the fund selling the shares at higher prices than their cost bases. This belief is not unreasonable in a case where, unlike *Ojeikere*, the fraud is not so egregious as to make it, "clear that no reasonable person would have given the defendant[s] money if [they] had known of [their] plan." *Archer*, 671 F.3d at 172.

For these reasons, the evidence before the Court is insufficient to support a finding of reliance as to any substantial number of investors, let alone 5,000 of them. Certainly, the evidence before the Court does not support a finding of $88 million in loss.

The Defense also notes that there is a difference between misrepresenting that the sales agents did not earn upfront compensation (which the defendants admit), and stating that there were, "no fees" associated with the purchases. The Government repeatedly conflates the two, even though they implicate different facts and different levels of scienter. The Defense recognizes that an undisclosed markup is a type of "fee." However, from Defendants' subjective standpoint, Capital Truth and Late Stage did not assess many of the fees that brokerage firms and investment funds routinely charge investors in similar circumstances. Indeed, when Mr. Pirrello joined Co-Conspirators 1 and 2 to do their marketing in 2016, he successfully urged them to forego charging such fees. While Defendants should have been more cognizant that their misrepresentations about the sales force earning upfront compensation amounted to a type of "fee," and while their failure to do so may have been professionally derelict, it was not definitively intentional at the time. This is especially so in light of the fact that the investors paid no other types of fees.

The takeaway here is that the Court should not use the "no fee" and "no upfront compensation" representations interchangeably when considering reliance, except in the context of Defendants' compensation itself. Defendants are already being held accountable for the sales agents' misrepresentations about being paid up front – the question of reliance falls upon whether and to what extent there were victims who invested because of that misrepresentation, not because of a belief that they were avoiding other types of fees that in reality they were not paying.

Accordingly, while Defendants are guilty of the charged offenses because their misrepresentations were material to investors' decisions whether or not to invest, such materiality does not equate to investor reliance sufficient to establish actual loss under USSG §2B1.1 and the MVRA.

## III. Restitution

For the foregoing reasons and under the authorities cited as they relate to determining actual loss under the MVRA, the Defense reiterates its position that the Government has failed to meet its burden to sustain any actual losses. As a result, no restitution can be ordered.

## IV. Forfeiture

The Government takes the position that the total amount of money transferred to the defendants' entities – $77,688,200 for Mr. Pirrello and $11,127,447 for Mr. Passalaqua – should be forfeited under a "control" theory, despite having full knowledge that the Defendants transferred the vast majority of these funds to the sales agents as compensation. Of note, the Government stated at the plea hearing with respect to Mr. Passalaqua that they would have to prove forfeiture in the amount of $7.4 million. Plea Hearing Tr. 17:8-14, Ex. B to Government's Submissions.

Assessing forfeiture well beyond personal gain is not permissible under these circumstances, and is also contrary to the determinations of Judges Furman and Broderick in the Southern District in near-identical circumstances.

The Second Circuit recently reaffirmed the principle that, "[c]riminal forfeiture focuses on the disgorgement by a defendant of his ill-gotten gains." *United States v. Elias*, 154 F.4th 56, 62–63 (2d Cir. 2025) (citing *United States v. Contorinis*, 692 F.3d 136, 146 (2d Cir. 2012)). "[T]he defendant's 'ill-gotten gains' [are] the typical measure of forfeiture." *Elias*, 154 F.4th at 73 (citing *Contorinis*, 692 F.3d at 146 and *United States v. Kaley,* 571 U.S. 323, 327 (2014)).

Critically, the payments made by the Defendants to the sales agents are deductible as, "direct costs" and are not, "overhead expenses" under 18 USC §981(a)(2)(B). The Government has already conceded that §981(a)(2)(B) applies to the instant case. (Gov't Memo, p. 20).

In *United States v. Mahaffy*, 693 F.3d 113, 138 (2d Cir. 2012), the Second Circuit held in a securities fraud case that the proper measure under § 981(a)(2)(B) is each defendant's, "net, not gross, gain (that is, the gross commissions paid to him less the significant portion of those commissions that went to his employer)." It is of no moment that the "commissions" in the instant case went to the sales agents and not to the Defendants' "employer."

Likewise, the two recent Southern District pre-IPO cases relating to the "StraightPath" funds (*Castillero, supra.* and *Gogliormella*, *supra*) involved millions of dollars of diverted investor monies generated from markups, which were used to pay sales agents as well as the owner co-conspirators. While the Defense distinguishes the "actual value" issues here under *Leonard*, *supra* from those in the StraightPath cases, the flow of investor monies to the StraightPath defendants' entities and then to their sales offices and sales agents was essentially the same as in our case. Judge Furman and Judge Brokerick both ruled that forfeiture would be limited to the defendants' personal gains in both cases. *See*, Sentencing Hr'g Tr. at 14, *Castillero*, ECF Dkt. No. 247 (deciding to limit forfeiture, "to the personal gains of the defendants"); Sentencing Hr'g Tr. at 42, *Gogliormella*, ECF Dkt. No. 119 (". . . each defendant involved here should only be responsible for the moneys that they received").

In another Southern District of New York case falling under § 981(a)(2)(B), the District Court held that the defendant was entitled to deduct as "direct costs" the commissions paid to independent-contractor salesmen whose pay was a percentage of the fees the company earned "on a deal-by-deal basis." The Court ordered the defendant to submit documentation detailing the amount of sales commissions paid, less the commissions paid by the company, from fees it received from the five customers who the defendant claimed received actual funding (i.e. the "direct costs"). *United States v. Kalish*, 2009 WL 10703707, at *7 (SDNY Jan. 30, 2009). In the instant case, the Government has already provided the requisite documentation detailing the Defendants' similar direct costs, therefore, no further showing by the Defense is necessary.

For the foregoing reasons, forfeiture should be limited to each Defendant's personal gains from the offenses.

Respectfully submitted,

Michael C. Farkas
*Of Counsel*
**Aidala, Bertuna & Kamins, P.C.**
*Counsel for Raymond J. Pirrello*

Christopher D. Adams
Marjan Moussavian
Zachary R. Cimring
**McCarter & English, LLP**
*Counsel for Joseph Passalaqua*