**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

JPL:JKW/JS
F. #2020R01171

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

October 14, 2026

By E-mail and ECF

The Honorable Kiyo A. Matsumoto
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Robert Cassino
Criminal Docket No. 23-499 (S-1) (KAM)

Dear Judge Matsumoto:

The government respectfully submits this letter in advance of the defendant Robert Cassino's sentencing, which is scheduled for Wednesday, October 28, 2026 at 11:00 a.m. On February 18, 2026, the defendant pleaded guilty to Count Two of the superseding indictment in the above captioned matter, which charged him with conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349. For the reasons set forth below, the government respectfully requests that the Court impose a custodial sentence within the advisory United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 121 to 151 months' imprisonment.

## I. Background

### A. Factual Background

As detailed in the Presentence Investigation Report ("PSR"), between March 2016 and March 2023, the defendant Robert Cassino and his co-conspirators, including co-defendants Raymond John Pirrello, Jr., Joseph Passalaqua and Joseph Rivera, engaged in a scheme to defraud investors and prospective investors in securities offered by Late Stage Management ("Late Stage") by making material misrepresentations and omissions relating to, among other things, the existence and amount of fees paid by investors in stock offered by Late Stage. PSR ¶ 21.

Late Stage managed a series of investment funds and invested in stock issued by privately held companies that, at the time of investment, purportedly anticipated either making an Initial Public Offering ("IPO") or being sold to a larger business in the relatively near term. PSR ¶ 8. Late Stage acquired these shares through an affiliate company called Capital Truth

Holdings.[1] Id. Late Stage, in turn, solicited investments in these stocks from individual investors, including investors located in the Eastern District of New York, using a series of marketing companies based in New Jersey, New York and Florida (the "sales offices"). Id. ¶ 9. Late Stage then published a list of available stocks and dictated to the sales offices at what prices these stocks could be sold. Id. ¶ 22. Late Stage, through the sales offices, solicited investments in various companies with household names, such as Airbnb and Palantir, as well as more obscure and lesser-known companies, such as Earth to Energy and Green Life Farms. See id. ¶ 23.

Pirrello directed the operation of the sales offices. PSR ¶ 13. Cassino led operations at Pre IPO Marketing, one of the sales offices. Id. ¶ 16. Together with Co-Conspirator #1 and Co-Conspirator #2, Pirrello dictated the pitch language that was used by employees at the sales offices to market investments in Late Stage. Id. ¶ 24. As part of that pitch, Pirrello directed the employees in their conversations with investors to depict the fund as having "no up front fees," and to specify that the only fee that would be charged to investors would be a carried interest of 20% of their profits upon exiting the investment. Id. Investors were therefore led to believe that all their invested capital was used to purchase stock. Id. In reality, however, a fee ranging from 10-100% of each investment was extracted up front in the form of a markup to the price of the stock. Id. The upfront revenue generated by the inclusion of these markups was then used to pay the principals of Late Stage, including the defendants and the employees of the sales offices.

Between approximately March 2016 and March 2023, Late Stage raised approximately $859 million from over five thousand investors, including investors residing in the Eastern District of New York, in more than 40 pre-IPO companies. To date, many of these companies have gone public. Between March 2019 and June 2022, i.e., a subset of the conspiracy period, Late Stage raised approximately $789 million from investors and more than $88 million of this was diverted in the form of undisclosed upfront compensation and fees.[2] Of the approximate $88 million in undisclosed upfront compensation, at least approximately $9.3 million was paid to Pre IPO Marketing—the sales office that Cassino led. Cassino personally gained approximately $2.3 million from the fraudulent scheme.

B. Defendant's Regulatory Disciplinary History

Cassino was a registered representative with Financial Industry Regulatory Authority, Inc. ("FINRA") since 1993. In addition, Cassino held Series 62 and 63 licenses. He was also the subject of several regulatory events in which he was disciplined. In 2005, Cassino's

---

[1] An individual referred to as "Co-Conspirator #1" in the Superseding Indictment was the managing partner of Late Stage. See PSR ¶ 8. The individual referred to as "Co-Conspirator #2" in the Superseding Indictment was the President of Capital Truth Holdings and acted as a business partner to Pirrello and Co-Conspirator #1. Id.

[2] Consistent with the superseding indictment, the PSR states that between March 2019 and July 2022, Late Stage raised approximately $528 million from investors. PSR ¶ 31. After the U.S. Probation Department issued the PSR, the government received additional information that confirms the total amount raised from investors in this timeframe was approximately $789 million.

registration as a salesperson in the state of Illinois was revoked, and he was barred from reapplying for two years. In 2004, the National Association of Securities Dealers barred Cassino from associating with any member of the organization in any capacity for 30 days and ordered him to pay disgorgement and partial restitution to a customer. In 1998, the State of Indiana's Securities Division barred Cassino from exercising discretionary authority over any Indiana customer accounts and mandated that he notify the Division of any complaint made by a customer in Indiana against him. In 1997, the State of Georgia's Security Commissioner reached an agreement with Cassino in which he agreed not to reapply for registration for a year and to reimburse the state. Cassino was also the subject of a customer complaint in 2004 that resulted in an over $1.5 million monetary award to the customer.

### C. Procedural History

On February 10, 2025, a grand jury sitting in the Eastern District of New York returned a superseding indictment charging the defendant and others with conspiracy to commit securities fraud in violation of 18 U.S.C. § 371, conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and substantive securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff. See ECF Dkt. No. 44. On February 13, 2025, the defendant self-surrendered and was released the same day on an appearance bond. PSR ¶ 34; id. at 1.

On February 18, 2026, the defendant pleaded guilty to Count Two of the superseding indictment, which charged him with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, pursuant to a plea agreement with the government. See PSR ¶ 1.

## II. The Sentencing Guidelines

As set forth in paragraphs 41–52 of the PSR and the parties' plea agreement, the Guidelines calculation is as follows:

| | | |
|---|---|---|
| Base Offense Level (U.S.S.G. § 2B1.1(a)(1)) | | 7 |
| Plus: | Loss exceeded $65,000,000 (U.S.S.G. § 2B1.1(b)(1)(M)) | +24 |
| Plus: | Offense involved 10 or more victims (U.S.S.G. § 2B1.1(b)(2)(A)(i)) | +2 |
| Plus: | Registered broker or dealer (U.S.S.G. § 2B1.1(b)(20)) | +4 |
| Less: | Zero-Point Offender (U.S.S.G. § 4C1.1) | -2 |
| Less: | Acceptance of Responsibility (U.S.S.G. § 3E1.1(b)) | -3 |
| Total: | | 32 |

Based on a Criminal History Category of I, the defendant's advisory Guidelines range is 121–151 months' imprisonment.

## III. The Appropriate Sentence

### A. Applicable Law

The Supreme Court has explained that the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [it] may not presume that the Guidelines range is reasonable. [It] must make an individualized assessment based on the facts presented." Id. at 50 (citation and footnote omitted). Title 18, United States Code, Section 3553(a) provides, in part, that in imposing sentence, the Court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]
>
> (2) the need for the sentence imposed--
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct; [and]
> >
> > (C) to protect the public from further crimes of the defendant.

Section 3553 also recognizes the need to afford the defendant opportunities for rehabilitation. See 18 U.S.C. § 3553(a)(2)(D). Thus, the Court must first calculate the correct Guidelines range, and then apply the 3553(a) factors to arrive at an appropriate sentence. The district court must also "remain cognizant of them throughout the sentencing process." Gall, 552 U.S. at 50 n.6.

### B. Analysis

For the reasons set forth below, the government believes that a Guidelines sentence is warranted. Such a sentence accounts for the nature and seriousness of the defendant's offense and is sufficient, but not greater than necessary, to satisfy the goals of sentencing.

A Guidelines sentence is appropriate to account for the scale of the fraud, its impact on thousands of investors, and the defendant's meaningful role in the years-long scheme. Over approximately seven years, the defendant and his co-conspirators raised over $750 million from over five thousand retail investors. The conspirators repeatedly lied to investors about the fees associated with securities sold by Late Stage and about their own compensation. They diverted over $88 million in investor funds to pay themselves handsomely. Cassino personally gained approximately $2.3 million from the scheme. This was plainly a crime driven by greed, rather than necessity.

While the defendant did not lead the scheme, his role in the scheme was still significant. He ran his own sales office—Pre IPO Marketing, Inc.—and spoke directly to prospective investors. He further admits that he "at times assisted others in training and coordination of other salespeople[,]" including on Zoom calls led by his co-defendant Pirrello. See ECF Dkt. No. 206 at 7. Indeed, Cassino recruited sales personnel and brought them into the scheme by introducing them to his co-defendant Pirrello.

A Guidelines sentence is also necessary to serve the purposes of deterrence. This case presents a heightened need for general deterrence. As the Second Circuit recently explained, "consideration of general deterrence is especially important" in white-collar cases. Watts v. United States, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023); see also United States v. Zukerman, 897 F.3d 423, 429 (2d Cir. 2018) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that are either lucrative or are difficult to detect and punish, since both go to increase the expected benefits of a crime and hence the punishment required to deter it."). Given the strong economic incentives to commit fraud, it is critical that there be equally strong counterincentives. See United States v. Cavera, 550 F.3d 180, 196 (2d Cir. 2008) (en banc) ("Where the profits to be made from violating a law are higher, the penalty needs to be correspondingly higher to achieve the same amount of deterrence."); see also S. Rep. No. 98-225, at 76 (1983), reprinted in 1984 U.S.C.C.A.N. 3182, 3259 ("Major white collar criminals often are sentenced to small fines and little or no imprisonment. Unfortunately, this creates the impression that certain offenses are punishable only by a small fine that can be written off as a cost of doing business.").

Notably, white-collar cases present the scenario where deterrence is most likely to be effective. As Judge Weinstein explained, "Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed." United States v. Stein, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010); see also United States v. Vrancea, 136 F. Supp. 3d 378, 392 (E.D.N.Y. 2015), aff'd, 688 F. App'x 94 (2d Cir. 2017) ("[T]he Second Circuit has noted the appropriateness of significant sentences for those who feel white collar crime is 'a game worth playing.'"). Because "economic and fraud-based crimes are more rational, cool and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." United States v. Martin, 455 F.3d 1227, 1240 (11th Cir. 2006); see also United States v. Marsh, No. 10-CR-480 (JBW), 2011 WL 5325410, at *1 (E.D.N.Y. Oct. 26, 2011) ("[I]ndividuals who engage in financial fraud can, at least in theory, be deterred by a substantial threat of penalties. Their actions are calculated. They choose to engage in white collar crime because they believe that the potential for significant financial benefits outweighs the risk that they will be punished.").

A Guidelines sentence will send the message to other would-be fraudsters that, when you get caught, the consequences will be steep, which will serve to deter similar crimes in the future. On the other hand, Cassino's requested non-custodial sentence would fail entirely to serve the goal of general deterrence. Such a lenient sentence would tell the community that a massive, years-long fraud by someone who repeatedly lied to investors for personal gain, is not worthy of serious punishment at all. Indeed, such a sentence would provide a would-be fraudster every incentive to perpetrate a fraud scheme—the reward is high, the chance of being caught and successfully prosecuted is low, and any resulting punishment is minimal at best. The government

respectfully submits that this is not the message the Court should send to the public through its sentencing of Cassino.

Specific deterrence is also particularly relevant here. It is clear that despite what should have been the chastening effect of multiple prior disciplinary infractions arising from misconduct he committed in the securities industry, the defendant was not deterred. Instead, his actions only escalated in severity over time, ultimately arising to the level of committing serious criminal conduct that defrauded thousands of investors of millions of dollars. While not recidivism in the traditional sense, the defendant's behavior nevertheless bespeaks his willful choice not to conduct his business in an honest and lawful manner.

The defendant argues that the loss calculation overstates the seriousness of his offense. See ECF Dkt. No. 7–8. This is not persuasive given how loss was calculated in this case. The loss amount here reflects actual loss to victim-investors. Every dollar of loss sustained by the victims was money that was diverted from purchasing shares in pre-IPO companies and used to pay the co-conspirators, including the defendant. This case is simple in this regard. The defendant lied so that he could personally profit.

Finally, the defendant urges the Court to impose a non-custodial sentence because his [redacted] See ECF Dkt. No. 206 at 8–9. The Court may consider the defendant's [redacted] pursuant to the factors set forth in 18 U.S.C. § 3553(a). The government recognizes that [redacted] may have played some role in his willingness to engage in the fraudulent scheme, and it commends the defendant's efforts and progress while on pre-trial release.[3] But the defendant must face appropriate punishment for his years-long fraud and the harm he inflicted upon his victims. See Smith v. Follette, 445 F.2d 955, 961 (2d Cir. 1971) ("[I]f every criminal act which was the result in some degree of a socially developed compulsion was beyond society's control, the interests and safety of the public would be seriously threatened. An addict who commits an affirmative illegal act, as distinguished from one whose only anti-social behavior is the mere presence of his addiction, may be constitutionally punished."); cf. United States v. DeRosse, No. 24-3235, 2026 WL 41202, at *2 (2d Cir. Jan. 7, 2026) (holding district court conducted individualized assessment at sentencing and "expressly acknowledged DeRosse's traumatic experiences—including violence during incarceration at a young age as well as his recent engagement with mental health and substance abuse treatment—but . . . reasonably concluded that those considerations did not overcome the seriousness of the offense, the need for deterrence, and the need to protect the public").

IV. Forfeiture and Restitution

The government respectfully requests that the Court order forfeiture in the amount of $2,329,870.83, which is a reasonable approximation of the funds received by the defendant that

[3] Because this submission references the defendant's medical information, the government respectfully requests permission to file a redacted version of this letter on the public docket and an unredacted version under seal. See, e.g., United States v. Fernandez, No. 17-CR-123 (LAP), 2025 WL 2322870, at *6 n.1 (S.D.N.Y. Aug. 12, 2025).

are traceable to the scheme. Pursuant the plea agreement, the defendant has agreed to forfeit $2,329,870.83 million in proceeds.

Restitution is mandatory pursuant to 18 U.S.C. § 3663A. The government respectfully submits that the Court should impose restitution in the full amount of the victims' actual losses, i.e., $88,017,974. See ECF Dkt. No. 205 at 13–17 (setting forth government's basis for restitution figure). The loss figure is disputed by the defendant's co-defendants Pirrello and Passalaqua and the Court has scheduled an evidentiary hearing for October 27, 2026 pursuant to United States v. Fatico, 579 F.2d 707 (2d Cir. 1978), to decide this issue. To ensure fairness and consistency among the defendants, the government respectfully submits that the Court should delay entering an order of restitution in Cassino's case until after the Court has resolved the issue of actual loss in Pirrello and Passalaqua's cases.

## V. Conclusion

For the foregoing reasons, and based on a balancing of the Section 3553(a) factors, the Court should impose a sentence within the advisory Guidelines range of 121 to 151 months' imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Jessica K. Weigel
James R. Simmons
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of the Court (KAM) (by ECF)
Counsel of Record (by ECF and E-mail)